IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-00083-RM

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

1. **FRANCIS F. JOSEPH,**

    **Defendant.**

---

**INDICTMENT**
**Count 1**
18 U.S.C. § 669
**Count 2**
18 U.S.C. § 641
**Count 3**
18 U.S.C. § 1343
**Count 4**
18 U.S.C. § 152(3)
**Forfeiture Allegation**
18 U.S.C. §§ 981(a)(1)(C), 982(a)(2), and 982(a)(7) and 28 U.S.C. § 2461(c)

---

The Grand Jury charges:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Defendant and Relevant Entities

1. FRANCIS F. JOSEPH was a resident of Douglas County, Colorado, within the District of Colorado. JOSEPH was a physician licensed to practice medicine in the State of Colorado.

2. Springs Medical Associates, P.C. a/k/a Springs Medical Associates, Inc. ("Springs Medical"), formed in or around August 2014 by FRANCIS F. JOSEPH, was a Colorado corporation that maintained its principal office in El Paso County, Colorado.

3. FRANCIS F. JOSEPH operated, managed, and controlled Springs Medical until on or about January 29, 2020, when he ceded management and control of Springs Medical as well as its finances, including its bank accounts, to Individual 1. Between January 29, 2020 and April 14, 2020, JOSEPH was employed by Springs Medical until he was terminated.

**Relevant Financial Accounts**

4. Springs Medical held business account x5191 at Bank 1 ("Official Springs Medical Account").

5. FRANCIS F. JOSEPH held account x6089 at Bank 1 in the name of a family member ("Family Member Account").

6. On or about March 27, 2020, unbeknownst to Springs Medical or Individual 1 and without authorization, FRANCIS F. JOSEPH opened account x0396 at Bank 2, in the name of Springs Medical with himself as the sole signatory ("Unofficial Springs Medical Account").

7. On or about October 29, 2020 and October 30, 2020, unbeknownst to Springs Medical or Individual 1 and without authorization, FRANCIS F. JOSEPH opened accounts x1462 and x7300, respectively, at Bank 3, in the name of Springs Medical with himself as the sole signatory ("Other Unofficial Springs Medical Accounts").

## The Medicare Program

8.      The Medicare Program ("Medicare") was a federally funded health care benefit program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled, and those who were 65 years of age or older.  The Centers for Medicare and Medicaid Services ("CMS"), a Federal agency under the United States Department of Health and Human Services ("HHS"), administered Medicare.

9.      The term "health care benefit program," under Title 18, United States Code, Section 24(b), was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

10.     Medicare was a "health care benefit program" pursuant to Title 18, United States Code, Section 24(b), and a "Federal health care program" pursuant to Title 42, United States Code, Section 1320a-7b(f).

11.     Medicare was divided into multiple parts.  Medicare Part A covered services provided by hospitals, skilled nursing facilities, hospices, among others.  Medicare Part B covered services provided by physicians, medical clinics, laboratories, among others.  Medicare Part C (or "Medicare Advantage") provided individuals with the option to receive their Medicare benefits through private insurers approved by Medicare, which may have entitled recipients to receive additional benefits.  Medicare Part D provided prescription drug coverage to persons who were eligible for Medicare benefits under Parts A and B.

12. Health care providers, including physicians and clinics (collectively, "Providers") who wished to be eligible to participate in Medicare Part B were requested to periodically sign an enrollment application form, that is, CMS Form 855I for physicians and CMS Form 855B for clinics. The enrollment forms, which were required to be signed by an authorized representative of the Provider, contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or the organization listed in Section 4A of this Application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

13. Providers that enrolled in Medicare and received a "provider number" were able to file claims with Medicare, either in hardcopy or electronically, to obtain reimbursement for services provided ("Medicare Provider").

14. CMS contracted with private insurance companies under Part B to receive, adjudicate, and pay Medicare claims submitted by Medicare Providers. Once contracted to process Medicare Part B claims, these private insurance companies were known as Medicare Administrative Contractors ("MACs"). CMS contracted with Novitas Solutions ("Novitas") to process and pay Medicare Part B claims in the state of Colorado.

### Accelerated and Advance Payment Program

15. On or about January 31, 2020, the Secretary of HHS declared that a public health emergency had existed in the United States since January 27, 2020 and continued to exist due to COVID-19. On April 21, 2020, July 23, 2020, October 2, 2020, and January

7, 2021, the Secretary of the HHS issued renewals of the existence of the public health emergency due to COVID-19.

16. In or around March 2020, in order to increase cash flow to Medicare Providers impacted by the pandemic, CMS expanded the existing Accelerated and Advance Payment Program to a broader group of Medicare Providers under both Medicare Part A and Part B.

17. The payments through the Accelerated and Advance Payment Program ("Advanced Payments") were intended to provide necessary funds due to a disruption in claims submission and/or claims processing. These Advanced Payments were offered in circumstances such as national emergencies or natural disasters in order to accelerate cash flow to the impacted Medicare Providers. CMS was authorized to provide Advanced Payments during the period of the COVID-19 public health emergency to any Medicare Provider who submitted a request to the appropriate MAC and met the required qualifications.

18. To qualify for Advanced Payments, the Medicare Provider was required to: (1) have billed Medicare for claims within 180 days immediately prior to the date of signature on the form requesting Advanced Payment ("Advance Payment Request Form"); (2) not be in bankruptcy; (3) not be under active medical review or program integrity investigation; and (4) not have any outstanding delinquent Medicare overpayments.

19. Medicare Providers would request a specific amount using an Advance Payment Request Form provided on each MAC's website. Most Medicare Providers were

able to request up to 100 percent of the Medicare payment amount for a three-month period.

20. Medicare Providers would continue to submit claims as usual after the issuance of the Advanced Payments. Medicare Providers would receive full payments for their claims prior to the start of a recoupment period, which would begin 365 days from the date of payment. During the recoupment period, Medicare would automatically offset amounts owed for new claims to repay the Advanced Payments.

### CARES Act Provider Relief Fund

21. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide emergency financial assistance to the millions of Americans suffering due to the COVID-19 pandemic.

22. The CARES Act appropriated moneys to help Medicare Providers that were financially impacted by COVID-19, as well as to provide care to individuals who were suffering from COVID-19 and compensate Medicare Providers for the cost of that care (the "Provider Relief Fund").

23. HHS, through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the Provider Relief Fund.

24. In order to rapidly provide funding to Medicare Providers during the pandemic, HRSA distributed payments under the Provider Relief Fund ("Provider Relief Payment") to Medicare Providers who (a) billed Medicare Part A or Part B in Calendar Year 2019; (b) provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19; (c) were not currently terminated from

participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; (d) were not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and (e) did not currently have Medicare billing privileges revoked.  Medicare Providers meeting these criteria automatically received the Provider Relief Payment and did not have to apply for the funding but were required to comply with the terms and conditions of the Provider Relief Fund if they retained such funding.

25. If a Medicare Provider elected to retain the payment, it was required to abide by the terms and conditions of the program, including that (a) the payment shall reimburse the recipient only for health care related expenses or lost revenues that are attributable to COVID-19 and (b) that the payment would only be used for the diagnoses, testing, or care for individuals with possible or actual cases of COVID-19.  Medicare Providers would attest to the terms and conditions by logging into a portal on the HHS website, or would be deemed to have agreed to the terms and conditions by keeping the funds for longer than 90 days.

## Small Business Administration

26. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and by assisting in the economic recovery of communities after disasters.

**The Paycheck Protection Program**

27. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

28. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

29. A business's PPP loan application was received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own monies. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

30. PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, mortgage interest, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these permissible expense items within a designated period of time after receiving the proceeds and used a certain portion of the loan proceeds on payroll expenses.

### Relevant PPP Lenders and Affiliated Companies

31. Company 1 was a financial-services company based in Georgia.

32. Company 1 was authorized by the SBA to participate as a PPP lender to small businesses.

33. Small businesses seeking PPP loans could apply through Company 1 for PPP loans. Company 1 would review the loan applications. If the loan application received by Company 1 was approved for funding, it disbursed the loan funds to the applicant.

### Bankruptcy

34. Individuals who filed for bankruptcy were known under Federal bankruptcy law as "debtors."

35. Bankruptcy was a process by which debtors obtained relief from their "creditors." Creditors were individuals, businesses, and government agencies who were owed money by the debtor. The bankruptcy process was designed to achieve the orderly distribution to creditors of available assets of the debtor that were truthfully disclosed. The bankruptcy process also provided a fresh start to debtors by allowing them to obtain

a "discharge" of debts, that is, an order that released the debtors from further personal liability for specified types of debts.

36. When filing for bankruptcy, and during the pendency of the bankruptcy, a debtor was required to disclose all of its assets to the bankruptcy court so that a determination could be made whether the assets were able to be used, in whole or in part, to reimburse creditors and pay off or reduce the debt. This included any assets the debtor received after filing for bankruptcy.

37. The filing of the bankruptcy petition created a "bankruptcy estate" consisting of all of the debtor's legal and equitable interests in property as of the commencement of the case. All of the debtor's tangible and intangible property belonged to the estate, including real estate, bank accounts, and equitable or future interests in property. Under Section 1115(a)(1) of the Bankruptcy Code, all property acquired by the debtor after commencement of the case was property of the estate.

38. Debtors were required to file a Schedule A/B of Assets with their petition for bankruptcy. The Schedule required debtors to "[d]isclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest." This included identifying checking, savings, money market, or financial brokerage accounts and the amount of money therein. In submitting the Voluntary Petition for Non-Individuals Filing for Bankruptcy, debtors were required to execute a "Declaration Under Penalty of Perjury," which included a notice that making a false statement or concealing property in connection with a bankruptcy case could result in fines up to $500,000 or imprisonment for up to 20 years, or both. The form included an

agreement, under penalty of perjury, that the signer was an authorized agent or representative on behalf of the debtor and had a reasonable belief that the information contained in the petition was true and correct.

## COUNT ONE
## 18 U.S.C. § 669

39. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 38 of this Indictment as though fully set forth herein.

40. On or about April 8, 2020, in the State and District of Colorado, and elsewhere, defendant FRANCIS F. JOSEPH did knowingly and willfully embezzle, steal, and without authority convert to the use of any person other than its rightful owner, and intentionally misapplied moneys, funds, property, and assets, with a value in excess of $100, that is approximately $86,747.11, of a health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is Medicare.

**Manner and Means**

41. On or about March 29, 2020, after relinquishing management and control of Springs Medical, and unbeknownst to Individual 1, FRANCIS F. JOSEPH completed and signed an Advanced Payment Request Form, purportedly on behalf of Springs Medical, requesting the maximum amount available from CMS.

42. In the Advanced Payment Request Form, FRANCIS F. JOSEPH acknowledged the terms of receiving the Advanced Payment, including that Springs Medical would have to repay to CMS the amount of the Advanced Payment.

43. In the Advanced Payment Request Form, FRANCIS F. JOSEPH further identified the reason for the Advanced Payment as being a "[d]elay in provider/supplier

billing process [ ] of an isolated temporary nature beyond the provider/supplier's normal billing cycle due to COVID-19 and not attributable to other third party payers or private patients."

44. That same day, FRANCIS F. JOSEPH submitted the Advance Payment Request Form under Springs Medical's provider number.

45. On or about April 7, 2020, Novitas made an Advanced Payment to Springs Medical by remitting approximately $86,747.11 in the Official Springs Medical Account, which became available the following day.

46. On or about April 8, 2020, upon the Advanced Payment becoming available in the Official Springs Medical Account and unbeknownst to Springs Medical and Individual 1, FRANCIS F. JOSEPH, without authority, electronically wire transferred approximately $92,000 from the Official Springs Medical Account to the Family Member Account, to which Springs Medical and Individual 1 did not have access.

In violation of Title 18, United States Code, Section 669.

## COUNT TWO
## 18 U.S.C. § 641

47. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 38 of this Indictment as though fully set forth herein.

48. On or about April 10, 2020, in the State and District of Colorado, and elsewhere, defendant FRANCIS F. JOSEPH did knowingly and willfully embezzle, steal, purloin, and convert to his own use or the use of another money or a thing of value greater than $1,000, that is approximately $31,782, from the United States Department of Health and Human Services.

**Manner and Means**

49.     As Springs Medical met the criteria under the Provider Relief Fund, on or about April 10, 2020, HRSA remitted approximately $31,782.20 in Provider Relief Payment to the Official Springs Medical Account to be used by Springs Medical to prevent, prepare for, and respond to COVID-19.

50.     On or about April 10, 2020, unbeknownst to Springs Medical and Individual 1, FRANCIS F. JOSEPH, without authority, electronically wire transferred approximately $31,782 from the Official Springs Medical Account to the Family Member Account, to which Springs Medical and Individual 1 did not have access.

51.     Thereafter, FRANCIS F. JOSEPH electronically wire transferred all or a portion of these monies into a separate account with which he made personal expenditures.

In violation of Title 18, United States Code, Section 641.

## COUNT THREE
## 18 U.S.C. § 1343

52.     The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 38 of this Indictment as though fully set forth herein.

53.     Beginning on or about March 27, 2020, and continuing through in or around July 2020, the exact dates unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, defendant FRANCIS F. JOSEPH having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly transmit and cause to be transmitted,

by means of wire communications in interstate commerce, writings, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

## Purpose of the Scheme

54. The purpose of the scheme was for FRANCIS F. JOSEPH to (a) unjustly enrich himself and others through the submission of a false and fraudulent PPP loan application; (b) conceal the submission of the false and fraudulent PPP loan application and the receipt and transfer of the proceeds from the fraud; and (c) divert proceeds of the fraud for his personal use and benefit.

## Manner and Means

55. As part of said scheme, on or about March 27, 2020, FRANCIS F. JOSEPH opened the Unofficial Springs Medical Account, which he concealed and disguised the existence of from Springs Medical and Individual 1.

56. As part of said scheme, on or about June 24, 2020, FRANCIS F. JOSEPH electronically submitted and caused to be submitted through interstate commerce a false and fraudulent PPP application in the name of Springs Medical to Company 1 (the "Springs Medical PPP application"), seeking a PPP loan in the amount of approximately $179,999, although FRANCIS F. JOSEPH had been previously terminated from Springs Medical by Individual 1. Specifically, FRANCIS F. JOSEPH was terminated because he misappropriated and took for himself funds that were provided to Springs Medical by various government agencies for the purpose of treating patients who were suffering from COVID-19.

57. As part of said scheme, FRANCIS F. JOSEPH signed the Springs Medical

PPP application and falsely certified that the application and all information provided therein, as well as the supporting documents and forms, were true and accurate.

58. As part of said scheme, in the Springs Medical PPP application, FRANCIS F. JOSEPH falsely represented himself to be the owner of Springs Medical. Among other things, FRANCIS F. JOSEPH falsely represented that he was "authorized, empowered, and directed" to borrow money, execute notes, and negotiate items on behalf of Springs Medical.

59. As part of said scheme, in the Springs Medical PPP application, FRANCIS F. JOSEPH falsely represented that he supervised 34 employees with an average monthly payroll of approximately $72,000, although FRANCIS F. JOSEPH had been terminated from Springs Medical approximately two months prior to the application.

60. As part of said scheme, in the Springs Medical PPP application, FRANCIS F. JOSEPH falsely represented that "the funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule."

61. As part of said scheme, in the Springs Medical PPP application, FRANCIS F. JOSEPH falsely certified that Springs Medical had not received another PPP loan, although FRANCIS F. JOSEPH previously applied for a PPP loan with another lender on behalf of Springs Medical using Springs Medical's Tax Identification Number.

62. As part of said scheme, FRANCIS F. JOSEPH sought to conceal and disguise the fraud by listing the Unofficial Springs Medical Account to receive the proceeds of the PPP loan, although FRANCIS F. JOSEPH knew that the Unofficial

Springs Medical Account was not the official business account for Springs Medical and did not otherwise receive payments or distribute payroll for Springs Medical.

63.     As part of said scheme, based on FRANCIS F. JOSEPH's material misrepresentations as set forth in the fraudulent Springs Medical PPP application and supporting documents, Company 1, based in Fulton County, Georgia, approved and funded the PPP loan.  On or about June 29, 2020, approximately $179,999 was electronically transferred to the Unofficial Springs Medical Account, which was maintained in Arapahoe County, Colorado, through interstate commerce, which FRANCIS F. JOSEPH then diverted for his own personal use and benefit, including a hotel stay in Jackson Hole, Wyoming and home improvements, such as a security system for his home.

### Execution of the Scheme

64.     On or about June 24, 2020, in the State and District of Colorado, and elsewhere, FRANCIS F. JOSEPH submitted and caused to be submitted a wire communication, to wit: electronic submission of the Springs Medical PPP application and supporting documents, from the District of Colorado, to Company 1, located outside the State of Colorado, in an attempt to execute, and in execution of the scheme, as described in paragraphs 54 through 63 of this Indictment.

In violation of Title 18, United States Code, Section 1343.

### COUNT FOUR
### 18 U.S.C. § 152(3)

65.     The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 38 of this Indictment as though fully set forth herein.

66.     On or about November 30, 2020, in the State and District of Colorado, defendant FRANCIS F. JOSEPH knowingly and fraudulently made a false declaration, certificate, verification, and statement under the penalty of perjury, as permitted under Section 1746 of Title 28, in and in relation to a case under Title 11, *In re: Springs Medical Associates, P.C.*, Bankruptcy Case No. 20-17026, by submitting Schedules of Assets and Liabilities and a Statement of Financial Affairs, in which the defendant fraudulently omitted to disclose all bank accounts maintained in the name of Springs Medical, including the Other Unofficial Springs Medical Accounts, and cash assets in the amount of approximately $241,774.85 deposited therein.

## Manner and Means

67.     On or about October 26, 2020, over six months after his termination from Springs Medical, unbeknownst to Springs Medical and Individual 1 and without authorization, FRANCIS F. JOSEPH filed for Chapter 11 bankruptcy in the District of Colorado on behalf of Springs Medical. As part of the bankruptcy petition, FRANCIS F. JOSEPH signed a declaration under penalty of perjury representing that he had the authority to file said petition on behalf of Springs Medical.

68.     On or about October 29, 2020 and on or about October 30, 2020, over six months after his termination from Springs Medical, unbeknownst to Springs Medical and Individual 1 and without authorization, FRANCIS F. JOSEPH opened the Other Unofficial Springs Medical Accounts at Bank 3 in the name of Springs Medical with himself as the sole signatory.

69.     On or about November 5, 2020, FRANCIS F. JOSEPH submitted a request

to Novitas to change the bank account information for receipt of Medicare payments from the Official Springs Medical Account to one of the Other Unofficial Springs Medical Accounts, ending in x1462. In the same request, FRANCIS F. JOSEPH represented that he was the sole owner and authorized official for Springs Medical. Following the request, on or about November 19, 2020, Novitas issued a Medicare payment for Springs Medical in the amount of approximately $241,774.85 to the Other Unofficial Springs Medical Account ending in x1462.

In violation of Title 18, United States Code, Sections 152(3).

## NOTICE OF FORFEITURE

70. Paragraphs 1 through 69 of this Indictment are incorporated herein by reference as factual allegations for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(a)(7) and Title 28, United States Code, Section 2461(c).

71. Upon conviction of Title 18, United States Code, Section 669, the offense alleged in Count 1 of this Indictment, defendant FRANCIS F. JOSEPH shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly or indirectly as a result of such offense, including, but not limited to a money judgment in the amount of the proceeds obtained by the defendant.

72. Upon conviction of Title 18, United States Code, Section 641, the offense alleged in Count 2 of this Indictment, and Title 18, United States Code, Section 152(3),

the offense alleged in Count 4 of this Indictment, defendant FRANCIS F. JOSEPH shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly or indirectly as a result of such offenses, including, but not limited to a money judgment in the amount of the proceeds obtained by the defendant.

73. Upon conviction of Title 18, United States Code, Section 1343, the offense alleged in Count 3 of this Indictment, defendant FRANCIS F. JOSEPH shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly or indirectly as a result of such offense, including, but not limited to a money judgment in the amount of the proceeds obtained by the defendant.  If any of the above-described forfeitable property, because of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value

of the forfeitable property described above.

| | |
|---|---|
| UNITED STATES OF AMERICA, by | **A TRUE BILL** |
| | Ink signature on file in Clerk's Office |
| | GRAND JURY FOREPERSON |

NICHOLAS L. MCQUAID
ACTING ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

| | |
|---|---|
| s/Emily M. Gurskis | March 17, 2021 |
| EMILY M. GURSKIS | DATE |
| TRIAL ATTORNEY | |
| CRIMINAL DIVISION, FRAUD SECTION | |
| UNITED STATES DEPARTMENT OF JUSTICE | |