# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JAN 13 2026**
JEFFREY P. COLWELL
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

FRANCIS JOSEPH,

Defendant.

**CASE NO. 1:21-CR-00083**

## MOTION FOR NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33

Dr. Francis Joseph files this motion for a new trial because newly discovered evidence establishes that the government's case rested on a legally incorrect premise. The jury convicted Dr. Joseph on the belief that he was not the owner of his medical practice and lacked lawful authority to operate the practice. Post-verdict evidence now shows that Dr. Joseph remained the sole shareholder and director of SMA. Because the verdict rests on a factual assumption now shown to be false, Rule 33 relief is warranted.

### SUMMARY OF THE CASE

The United States charged Dr. Francis F. Joseph with wire fraud, theft or embezzlement in connection with health care, and related offenses arising from financial transactions involving Springs Medical Associates, P.C. ("SMA"). The government alleged that Dr. Joseph improperly controlled SMA's finances and engaged

in unauthorized transactions connected to federal COVID-19 relief funds. CRIM ECF No. 1.

In January 2023, a jury convicted Dr. Joseph of wire fraud in violation of 18 U.S.C. § 1343 and theft or embezzlement in connection with health care in violation of 18 U.S.C. § 669. The jury acquitted him of theft of government funds under 18 U.S.C. § 641. The district court entered judgment on the wire-fraud and health-care theft convictions and sentenced Dr. Joseph to 30 months of imprisonment followed by supervised release. Dr. Joseph appealed. The United States Court of Appeals for the Tenth Circuit affirmed the convictions, and the judgment is now final. Dr. Joseph has already served his full sentence and is now in Immigration and Customs Enforcement custody because of the conviction.

The government's case depended on a single, essential theory: Dr. Joseph was not the legal owner of SMA during the charged conduct. The prosecution repeatedly asserted that he lacked lawful authority over SMA and that his financial actions were therefore fraudulent by definition. That ownership premise supplied the foundation for every charged transaction and every theory of intent presented to the jury.

After the criminal trial and appeal concluded, bankruptcy proceedings involving SMA produced evidence that was not available and could not have been presented at trial. *See In re Springs Medical Associates, P.C.*, No. 20-17026-MER (Bankr. D. Colo.), and the related adversary proceeding, *Lofstedt v. Papalini et al.*, Adv. No. 22-01262-MER.

In those proceedings, the Trustee found, and the bankruptcy court adopted, that

2

Dr. Joseph was SMA's sole shareholder and sole director under Colorado law. The bankruptcy court rejected repeated arguments that Dr. Joseph lacked authority to act for SMA, including arguments raised by Eric Papalini and others who had usurped control from Dr. Joseph. The court converted the case to Chapter 7 and proceeded on the express premise that Dr. Joseph held lawful ownership and corporate authority.

That finding matters. It eliminates the factual condition the government relied on to criminalize Dr. Joseph's conduct. If Dr. Joseph owned SMA and possessed legal authority over its finances, and he did, the government's "unauthorized conduct" narrative collapses. Transactions the prosecution labeled fraudulent become acts taken by the lawful owner of the entity itself.

This evidence did not exist at the time of trial. Dr. Joseph could not have discovered it earlier through diligence. The bankruptcy court's rulings post-date the criminal proceedings and resolve the precise legal question the jury was never allowed to answer. When Dr. Joseph tried to raise this defense at trial, the Court barred him, saying that there was no evidence he was the legal owner of SMA.

## SUMMARY OF THE ARGUMENT

The government won its conviction of Dr. Francis Joseph by persuading the jury of one decisive claim: Dr. Joseph lacked lawful authority over SMA and knowingly ran the business anyway. That claim drove the entire case. The prosecution framed Dr. Joseph's control of bank accounts, direction of payments, execution of documents, and management of the practice as criminal only because, according to the government, authority had passed to a non-physician. The jury assessed intent through that lens.

3

But that lens was wrong. After the trial and appeal, bankruptcy proceedings placed the ownership and authority question before a court with the power and obligation to decide it. A Chapter 7 trustee conducted a fiduciary investigation of SMA's corporate governance and concluded that Dr. Joseph remained the sole shareholder and sole director throughout the charged period. The trustee further determined that Colorado law prohibited a non-physician from owning or controlling a medical practice and that the documents relied upon at trial could not transfer authority as a matter of law. The bankruptcy court adopted the trustee's findings and proceeded on that framework, rejecting claims that Dr. Joseph lacked authority and recognized him as the lawful owner and decision-maker.

That evidence goes straight to the heart of the verdict. The jury never evaluated intent under the correct legal theory because that theory did not yet exist in adjudicated form. Once the authority question is answered, the bankruptcy court has now answered it, the government's theory fails. Acts the jury viewed as fraudulent depended entirely on the assumption that Dr. Joseph had no right to perform them. Newly discovered evidence establishes that he did. A verdict built on a false authority premise cannot stand, and Rule 33 requires a new trial.

## ARGUMENT

### I. THE VERDICT WAS PREMISED ON THE ASSERTION THAT DR. JOSEPH LACKED LAWFUL AUTHORITY OVER SPRINGS MEDICAL ASSOCIATES

The government's prosecution of Dr. Joseph was built around a single factual assertion: that he no longer possessed lawful authority over Springs Medical Associates ("SMA"). According to the government, that authority had passed to Eric Papalini, and

4

Dr. Joseph's continued involvement with the practice, managing its finances, signing checks, directing billing, and holding himself out as the principal, was therefore unauthorized and fraudulent. That assertion was not merely one strand of the government's case. It was the factual predicate that converted otherwise lawful conduct into criminal fraud.

### A. The Government's Proof of Intent Required the Jury to Find That Dr. Joseph Lacked Authority

The government's prosecution of Dr. Joseph was built around a single factual assertion: that he no longer possessed lawful authority over Springs Medical Associates ("SMA"). According to the government, that authority had passed to Eric Papalini, and Dr. Joseph's continued involvement with the practice, managing its finances, signing checks, directing billing, and holding himself out as the principal, was therefore fraudulent. That assertion was not merely one strand of the government's case. It was the entire factual predicate that converted otherwise lawful conduct into criminal fraud.

The indictment framed the charges on that basis. ECF No. 1. Throughout trial, the government consistently argued that Dr. Joseph's conduct was deceptive because he allegedly knew he no longer owned or controlled SMA and nevertheless acted as though he did. The prosecution did not contend that the acts themselves were illegal in the abstract. It contended that they were illegal because Dr. Joseph supposedly lacked the authority to perform them. That framing permeated the government's evidence and argument and supplied the foundation for its proof of intent. *See* Trial Tr., Jan. 9–13, 2023 (government openings, witness examinations, and closing).

The jury's verdict necessarily reflects acceptance of that framing. To find Dr. Joseph guilty, the jury had to conclude that he acted without lawful authority over SMA. There is no path to a finding of fraudulent intent in this case that does not pass through that conclusion. The jury was not asked to determine whether Dr. Joseph's conduct would have been unlawful had he retained authority. The government's theory did not permit such a finding. Fraud, as presented to the jury, arose solely from the asserted absence of authority.

The trial record also demonstrates that the jury was never positioned to evaluate whether that assertion was correct as a matter of law. Dr. Joseph sought to present evidence and argument showing that, under Colorado law, only a licensed physician may own or control a medical practice and that Papalini, a non-physician, could not lawfully acquire such authority. He further sought to show that documents relied upon by the government, including the Joint Action Agreement, were legally ineffective to transfer ownership or control of SMA. The trial court excluded or sharply limited that evidence, concluding that ownership and CPOM principles were irrelevant or insufficiently supported. *See* Trial Rulings, BANKR. ECF Nos. 98–99.

As a result, the jury was never asked to determine whether Papalini's claimed authority could lawfully exist. The government's assertion that Papalini had taken control of SMA was treated as an operative premise rather than a legal question to be resolved. The jury's task was reduced to deciding whether Dr. Joseph continued to act as though he controlled the practice. Once that was established, guilt followed as a matter of inference.

6

## B. Evidence Developed After Trial Clarified Dr. Joseph's Lawful Authority

That structure of the case matters now because new post-verdict evidence directly addresses, and clarifies, the authority question that the jury was never allowed to resolve.

After Dr. Joseph's conviction, the United States Bankruptcy Court for the District of Colorado appointed a Chapter 7 trustee to investigate SMA's ownership, governance, and financial affairs. Acting as a neutral fiduciary, the trustee examined SMA's bylaws, corporate records, assignments, agreements, emails, and financial transactions. Based on that investigation, the trustee made express factual representations in sworn filings submitted to the bankruptcy court.[1]

The trustee stated that "it is undisputed that Dr. Joseph was the sole shareholder and director when the underlying case was commenced." BANKR. ECF No. 52 at 4. The trustee explained that under Colorado corporate law, shareholders elect directors and directors exercise management authority. *Id.* Applying that framework to SMA's governing documents, the trustee concluded that Dr. Joseph retained decision-making authority and that no subsequent corporate action lawfully displaced him. *Id.* at 16–17. The trustee specifically rejected the contention that the Joint Action

---

[1] The trustee's sworn factual representations became part of the bankruptcy court record and were adopted by the court for purposes of judicial decision-making. In denying motions premised on Papalini's claimed authority and lack of authority by Dr. Joseph, the bankruptcy court necessarily accepted the trustee's ownership and governance framework as sufficient and controlling for purposes of the proceeding. *See* ECF No. 73. Although the court did not issue a standalone order expressly labeled as "findings of fact," it relied on the trustee's representations in ruling and did not reject or contradict them. That judicial reliance gives the trustee's factual representations evidentiary and legal significance beyond mere party allegations.

Agreement altered that reality, explaining that "[t]he Joint Action does not change this result." *Id.* at 17.

The trustee further addressed the foundation of Papalini's claimed authority. Under Colorado's prohibition on the corporate practice of medicine, only a licensed physician may own or control a medical practice. Papalini is not a physician. The trustee therefore concluded that Papalini "could never legally hold ownership or control of SMA." BANKR. ECF No. 52 at 3–4. In the trustee's analysis, the documents relied upon by Papalini, and by extension the government, were legally incapable of transferring ownership or ultimate control of SMA to a non-physician. *Id.* at 16–17.

The trustee also clarified that neither the state-court injunction orders nor the criminal conviction ever resolved the ownership or authority question on which the government's theory depended. As the trustee explained, those orders "never make any finding that Dr. Joseph is not the sole owner of SMA," "never make any finding that Dr. Joseph was not the sole director or not the sole shareholder," and the conviction itself "has nothing to do with whether the Colorado law gave Dr. Joseph the authority" to act for SMA. BANKR. ECF No. 52 at 3.

That clarification matters because it shows that the government's authority premise was never the product of a prior adjudication, but an assumption carried forward into trial and treated as settled. The post-verdict proceedings are the first to examine that assumption directly and to do so under the governing corporate and medical-practice framework.

The bankruptcy court denied motions premised on Papalini's claimed authority

8

and allowed the trustee's claims to proceed based on the trustee's ownership framework: that Dr. Joseph was the legal and true owner of SMA at all times. BANKR. ECF No. 73. Earlier in the bankruptcy case, the court had already rejected Papalini's argument that Dr. Joseph lacked authority to act for SMA, expressly recognizing Dr. Joseph's status as sole shareholder and director. *See* BANKR. ECF No. 52 at 5–6 (quoting Conversion Hearing Tr., Jan. 14, 2021).

When the trial record and the post-verdict record are read together, the issue presented by this motion comes into sharp relief. The jury convicted Dr. Joseph on the understanding that he acted without lawful authority over SMA. That understanding was central to the government's theory and essential to the inference of fraudulent intent. The post-verdict bankruptcy proceedings now clarify that the authority question, the foundation of that understanding, was materially different from what the jury was led to assume.

This motion turns on how newly discovered, court-supervised findings illuminate the factual premise on which the government's theory of guilt depended. The post-verdict record does not supplement the trial evidence; it resolves an authority question the jury was never permitted to decide, and it does so in a manner that directly informs the inference of intent.

Read together, the trial record and the post-verdict record expose a fracture at the core of the verdict. The jury's finding of guilt rested on the premise that Dr. Joseph lacked lawful authority and ownership of Springs Medical Associates. The newly discovered evidence establishes that authority and ownership existed as a matter of

9

law. That disconnect defines the Rule 33 inquiry and frames what follows.

## C. The Government's Case Collapses Under the Newly Discovered Evidence

The post-conviction bankruptcy record does not merely "support" Dr. Joseph's position. It changes the evidentiary landscape in the exact place the government staked its case: who possessed lawful authority over Springs Medical Associates, and whether the documents the government relied upon could lawfully transfer that authority to Eric Papalini. The trustee's filings and the accompanying exhibits address the ownership dispute in a way the criminal trial record never could, because they were generated through a court-supervised investigation with access to corporate governance materials, financial tracing, and documentary communications that were not available in developed form at trial.

The trustee did not offer a defense theory. The trustee performed a fiduciary function: identify corporate authority, determine who could act for the estate, and investigate transfers and claims of control. The trustee's sworn response makes that clear by grounding its conclusions in corporate governance mechanics. The trustee explained that shareholders select directors and directors are the "decision makers," then applied that framework to SMA's governing documents and concluded, without equivocation, that Dr. Joseph was the sole shareholder and sole director when the case commenced. BANKR. ECF No. 52 at 4. That conclusion matters because it is not merely a label of "ownership"; it is the direct answer to the government's "authority" premise. If Dr. Joseph remained the sole director, he remained the decision-maker. Period.

10

The trustee also addressed the alleged documents that the government and Papalini used to claim a transfer of power. Rather than treating the Joint Action as a talisman that ended Dr. Joseph's authority, the trustee analyzed its legal effect and explained that it did not change the governance outcome reflected in the bylaws and corporate structure. BANKR. ECF No. 52 at 16–17. The trustee's bottom-line statement, "The Joint Action does not change this result," speaks directly to the government's trial narrative, because the government's entire fraud theory depends on the opposite proposition. *Id.* at 17. The trustee's analysis does not simply create "reasonable doubt." It directly negates the factual predicate from which the government asked the jury to infer intent, and therefore guilt.

The trustee then moved beyond governance mechanics and addressed the legal impossibility at the heart of Papalini's claimed ownership. Under Colorado's prohibition on the corporate practice of medicine, only a licensed physician may own or control a medical practice. BANKR. ECF No. 52 at 3–4. Papalini is not a physician. *Id.* The trustee's sworn filing therefore concluded that Papalini "could never legally hold ownership or control of SMA." *Id.* That statement is important not as an abstract proposition of state law, but because it strips the government's narrative of its core assumption: that Papalini could "lawfully assume" authority in the first place. If Papalini could never lawfully own or control SMA, then Dr. Joseph's continued control cannot be framed as "unauthorized" conduct. The bankruptcy record supplies a legal reality the jury never received.

The documentary record attached to the trustee's complaint demonstrates why

11

this clarification is not academic. The complaint was filed with sixteen exhibits that track the same relationships and documents the government relied upon, but with additional material that reveals the mechanics of the attempted takeover and the communications surrounding it. CRIM ECF No. 1. Those exhibits include, among other things, documents and assignments reflecting Papalini's effort to seize control, and email communications that bear directly on motive, premeditation, and the legitimacy, or illegitimacy, of Papalini's claimed authority. *Id.* This is the kind of contemporaneous, documentary proof that a jury can weigh in a way it cannot weigh attorney argument. And it is exactly the kind of proof that matters in a case where the government framed intent as "he knew he had no authority."

The bankruptcy court's actions reinforce the point. The court did not treat the trustee's ownership framework as a speculative allegation unmoored from reality. It denied motions premised on Papalini's claimed authority and allowed the trustee's claims to proceed. BANKR. ECF No. 73. Earlier in the bankruptcy case, the court had already rejected Papalini's argument that Dr. Joseph lacked authority to act for SMA, recognizing Dr. Joseph's status as the sole shareholder and director. *See* BANKR. ECF No. 52 at 5–6. That posture matters because it shows that the trustee's authority framework is not a one-off assertion that languished untested; it is the operative framework that governed the bankruptcy court's handling of who could act for SMA and who could not.

This is precisely why the bankruptcy record carries the weight it does for Rule 33 purposes. The jury convicted on a narrative of "no authority," and it did so without

access to the court-supervised, fiduciary-developed record that now clarifies who possessed authority under corporate governance rules and under Colorado's medical practice restrictions. The trustee's filings, the attached exhibits, and the court's acceptance of that framework supply the objective proof that the trial record lacked, and they do so on the exact issue the government used to convert lawful acts into criminal intent.

When new post-verdict evidence answers the authority question in a way the jury never had the tools to answer, it becomes impossible to treat the verdict as though it rested on a fully informed evaluation of the government's premise. That is why this newly discovered evidence matters, and why the motion should be granted.

## II. THE TRIAL RECORD CONFIRMS THAT THE JURY EVALUATED INTENT UNDER AN ASSUMED AUTHORITY FRAMEWORK THAT WAS NEVER TESTED, AND THAT THE MISSING FRAMEWORK IS THE ONE THE POST-VERDICT RECORD NOW SUPPLIES.

The jury's verdict must be understood in light of the framework within which the jury was asked to evaluate intent. At trial, Dr. Joseph sought to show that the government's theory of "unauthorized conduct" rested on a legal impossibility: under Colorado law, only a licensed physician may own or control a medical practice, and Eric Papalini, who is not a physician, could not lawfully assume ownership or control of Springs Medical Associates. From that premise followed a critical conclusion: Dr. Joseph never lost lawful authority over SMA, and his continued operation of the practice could not be treated as evidence of fraud.

The jury was not permitted to evaluate that framework. Ownership and CPOM principles were excluded or sharply limited, and the jury was instructed to assess Dr.

13

Joseph's conduct without resolving whether Papalini's claimed authority could lawfully exist. See Trial Rulings, BANKR. ECF Nos. 98–99. As a result, the jury's task was structured around an assumed fact, that Papalini's claimed ownership and control were legally operative, rather than around a determination of whether that claim was valid under governing law.

That assumption shaped how the evidence was received. The government introduced evidence showing that Papalini exercised control: access to bank accounts, involvement in billing, communications asserting authority, and documents purporting to formalize that control. Within the framework the jury was given, that evidence appeared to support the conclusion that Dr. Joseph acted deceptively by continuing to operate SMA. But the jury was never asked to decide whether Papalini's asserted control could lawfully displace Dr. Joseph's authority in the first place. The legal meaning of that control was never adjudicated for the jury.

This distinction matters because the inference of fraudulent intent depended on it. The jury was not asked whether Dr. Joseph acted dishonestly despite retaining authority. It was asked whether he acted dishonestly because he lacked authority. Once the premise of "no authority" was accepted, the remaining steps in the government's theory followed predictably. The structure of the case did not invite the jury to test that premise; it required the jury to assume it.

The trial record also explains why the ownership question appeared, at the time, to be ill-suited for jury consideration. Dr. Joseph did not then possess a developed, objective record resolving SMA's ownership and governance under corporate law. There

14

was no court-appointed fiduciary, no formal investigation of corporate records, and no judicial proceeding that had examined whether the documents relied upon by the government could lawfully transfer ownership or control of a medical practice to a non-physician. Without that foundation, the ownership issue appeared as a disputed factual matter entangled with other proceedings, rather than as a discrete legal question capable of resolution.

The bankruptcy proceedings altered that posture in a way the trial record could not. The trustee examined SMA's governing documents, applied Colorado corporate law and CPOM restrictions, and concluded that Dr. Joseph was the sole shareholder and director and that Papalini never lawfully acquired authority. BANKR. ECF No. 52 at 3–4, 16–17. The bankruptcy court proceeded on that framework in determining who could act for SMA and in rejecting arguments premised on Papalini's claimed authority. BANKR. ECF No. 73. That process supplied an authoritative resolution of the very question the jury was never permitted to resolve.

Placed alongside the trial record, the significance of that clarification becomes clear. The jury did not reject an ownership-based defense after hearing it fully developed and supported by objective proof. The jury never evaluated intent under the correct legal framework because that framework was not available in developed form and was therefore removed from the case. The post-verdict record now supplies what was missing: a legally grounded resolution of authority that bears directly on the inference of fraud the jury was asked to draw.

This does not recast the trial as unfair or suggest that the jury failed in its role.

It explains why the verdict took the shape it did and why newly discovered evidence resolving the authority question bears so directly on the reliability of the intent finding. The jury decided the case it was given. The record now clarifies that a foundational assumption embedded in that case does not hold.

III.   **WHEN THE AUTHORITY FRAMEWORK CLARIFIED BY THE BANKRUPTCY RECORD IS APPLIED, THE JURY'S FINDING OF FRAUDULENT INTENT CANNOT BE SUSTAINED.**

The government's proof of fraudulent intent depended on a single inference: that Dr. Joseph knowingly acted without authority and deliberately misrepresented his role in order to deceive. That inference was available to the jury only because the jury was asked to assume that Dr. Joseph lacked lawful authority over Springs Medical Associates. Once that assumption is examined in light of the post-verdict bankruptcy record, the inference no longer holds.

The bankruptcy proceedings clarify that Dr. Joseph was the sole shareholder and sole director of SMA, that he retained decision-making authority under corporate governance principles, and that Eric Papalini, who is not a licensed physician, never lawfully acquired ownership or control of the practice. BANKR. ECF No. 52 at 3–4, 16–17. The documents the government relied upon to suggest otherwise were legally ineffective to transfer authority to a non-physician. Id. The bankruptcy court proceeded on that framework in determining who could act for SMA and in rejecting arguments premised on Papalini's claimed authority. BANKR. ECF No. 73.

When those facts are applied to the conduct the government characterized as fraudulent, the character of that conduct changes. Managing finances, directing billing,

signing checks, and holding oneself out as the principal of a business are not deceptive acts when performed by the person who lawfully owns and controls that business. They are ordinary incidents of authority. The government did not argue, and the jury was not asked to find, that Dr. Joseph engaged in deception independent of the asserted lack of authority. The absence of authority was the predicate for intent.

The newly discovered evidence does not ask the Court to speculate about how the jury might have reacted to different evidence. It clarifies the factual reality against which the jury's inference of intent must be measured. The jury found intent based on a premise that Dr. Joseph was acting without authority. The bankruptcy record clarifies that authority existed as a matter of law. Once that clarification is placed alongside the verdict, the reliability of the intent finding is called into question.

This is not a case where newly discovered evidence merely strengthens an alternative narrative or impeaches a witness. It resolves the factual condition that supplied the government's theory of guilt. The trustee's findings and the bankruptcy court's acceptance of those findings establish that the government's "unauthorized conduct" narrative rested on an assumption that does not hold under governing law. That clarification bears directly on whether the conduct proved at trial can sustain a finding of fraudulent intent beyond a reasonable doubt.

Rule 33 exists to address circumstances in which newly discovered evidence alters the factual context in which a verdict was reached. The bankruptcy record does exactly that here. It places the jury's verdict against a clarified factual backdrop that was unavailable at the time and that directly bears on the central inference of guilt.

Viewed as a whole, the record now reflects a conviction based on a theory that required Dr. Joseph to lack authority, and newly discovered evidence showing that he did not. That juxtaposition does not resolve itself. It leaves the verdict standing on a premise that has since been materially clarified in a way that undermines the inference on which guilt depended.

## CONCLUSION

The jury convicted Dr. Joseph because it believed he was not the owner of Springs Medical Associates and lacked authority to operate the practice. That belief was essential to the verdict. Newly discovered evidence now establishes that Dr. Joseph was the sole shareholder and sole director of SMA, that only a licensed physician could lawfully control the practice, and that Eric Papalini never possessed lawful ownership or authority. The documents relied upon at trial could not transfer control as a matter of law. The jury never evaluated intent under these facts. The verdict therefore rests on a factual assumption that is now shown to be false. A new trial should be granted.

Respectfully submitted,

Date: 1/12/26

Francis Joseph # 25 04143
Pike County Correctional Facility
175 Pike County Road
Lords Valley, PA 18428

## CERTIFICATE OF SERVICE

I affirm, under the penalty of perjury, that this document was mailed to the

following on the date below:

United States District Court
Alfred A. Arraj U.S. Courthouse
901 19th Street
Denver, CO 80294-3589

U.S. Attorney's Office
1801 California Street
Suite 1600
Denver, CO 80202

Date: 1/12/26

Francis Joseph # 25 04143
Pike County Correctional Facility
175 Pike County Road
Lords Valley, PA 18428



mely Urgent

Express

COURT SECURITY
901 19TH ST
DENVER CO 80294
P:RED  S:ORANGEVIL
B213-1807
1Z6GE4913363O 5495  2330
1ZWT0B205 XLE X9-1 Jan 13 05:42:07 2020
US 0001 UUC 25.9 SKTDLX

UPS ®

Scanned by
US Marshal



1 OF 1

1 LBS PAK

FRANCIS JOSEPH #25 0414 3
BUZ500-5520
PIKE COUNTY CORRECTIONAL FACIL
175 PIKE COUNTY BLVD
LORDS VALLEY PA 18428

SHIP TO:
UNITED STATES DISTRICT COURT
ALFRED A. ARRAJ U.S. COURTHOUSE
901 19TH ST
DENVER CO 80294-2500

CO 802 9-50

UPS NEXT DAY AIR SAVER   1P

TRACKING #: 1Z G5E 949 13 3830 5495

BILLING: 3RD PARTY

XOL 25.12.22     NV45 3.0A 01/2020P

Express®

Expedited®

**Shipments**
for the letter rate
idence, urgent do
ss: UPS Express en
ng more than 8oz

**nal Shipments**
xpress envelope r
tain countries con
mportexport to verify if your shipment is classified as a document.

for the letter rate, the UPS Express envelope must weigh 8 oz. or less.
ss envelopes weighing more than 8 oz. will be billed by weight.

Express envelopes are not recommended for shipments of
nedia containing sensitive personal information or breakable items.
d cash or cash equivalent.

code to
e a pickup

Serving you for more than 110 years
United Parcel Service.®



For information about UPS's privacy practices or to opt out from the sale of
personal information, please see the UPS Privacy Notice at www.ups.com

al Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established
ention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on