**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Raymond P. Moore**

Criminal Action No. 21-cr-00083-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

FRANCIS F. JOSEPH,

      Defendant.

---

**ORDER DENYING MOTION FOR NEW TRIAL**

---

This matter is before the Court on the facially[1] *pro se* motion of Defendant ("Joseph") captioned as "Motion for New Trial Pursuant to Federal Rule of Criminal Procedure 33" (ECF No. 202, hereinafter the "Motion"). The Court has considered the Motion, the government's Response (ECF No. 204, hereinafter the "Govt Response"), and Joseph's Reply (ECF No. 208, hereinafter the "Reply"). The Court has also reviewed the docket generally as well as the bankruptcy proceedings upon which the Motion is based. Having reviewed the foregoing and given the Court's overall familiarity with this matter as the trial court, the Motion is DENIED for the reasons set forth below.

### I.      Procedural Background.

On March 17, 2021, a four count indictment was returned charging Joseph with theft, embezzlement and conversion of health care benefit funds in violation of 18 U.S.C. § 669 (Count

---

[1] *See* Note 3, below.

One); theft, embezzlement and conversion of government property in violation of 18 U.S.C. § 641 (Count Two); wire fraud in violation of 18 U.S.C. § 1343 (Count Three); and false statements in bankruptcy proceedings in violation of 18 U.S.C. § 152(3) (Count Four). The government voluntarily dismissed Count Four, and Joseph proceeded to trial on the remaining counts beginning on January 9, 2023. On January 13, 2023, the jury returned a verdict convicting Joseph on Counts One and Three and acquitting him on Count Two. Joseph was sentenced on June 1, 2023, to an imprisonment term of 30 months (which has now been served), supervised release, and restitution.

Through appointed appellate counsel, Joseph appealed his convictions to the United States Court of Appeals for the Tenth Circuit. His opening brief was filed in November 2023. *United States v. Joseph*, No. 23-1192, Doc. No. 63 (10th Cir. Nov. 3, 2023). The Tenth Circuit affirmed his convictions and sentence. (ECF No. 182; *United States v. Joseph*, 108 F.4th 1273 (10th Cir. 2024) ("Joseph Opinion").) Thereafter, Joseph filed a *pro se* brief seeking panel rehearing or rehearing *en banc*. *United States v. Joseph*, No. 23-1192, Doc. No. 115-1 (10th Cir. Oct. 31, 2024) (the "Rehearing Petition"). This petition was denied. *United States v. Joseph*, No. 23-1192, Doc. No. 116 (10th Cir. Nov. 25, 2024). He then petitioned the Supreme Court for a writ of certiorari. (ECF No. 200.) That petition was denied on June 30, 2025. (ECF No. 201.)

After serving his sentence, Joseph was transferred into Immigration and Customs Enforcement ("ICE") custody.[2] While in ICE custody in Pennsylvania, he seems to have had the Motion prepared, signed, and deposited with UPS on January 12, 2026, for next day air delivery

---

[2] Joseph is a citizen and national of India who acquired lawful permanent resident status on August 13, 2004. An Order of Removal has been issued by an immigration judge, and Joseph is currently engaged in appeals and related proceedings.

by someone else.[3] The Motion was received by the Court and filed on January 13, 2026. Neither timeliness nor authenticity has been raised by the government.

## II.    Factual Background.

The Joseph Opinion contains a summary of the facts established at trial. It is incorporated herein by reference. Nonetheless, in order to provide context for this Order, the Court sets forth the following brief description of the facts pertaining to the counts of conviction.

Joseph was the founder, sole shareholder, sole officer, and sole director of a business entity and medical practice called Springs Medical Associates P.C. ("SMA") formed in 2014. In the 2019/2020 timeframe, SMA was undergoing financial difficulties and sought to resolve them by borrowing money from an entity named Equitifirst Funding which was owned and controlled by Eric Papalini ("Papalini"). As part of the funding arrangement, Joseph – as director and shareholder – executed a Joint Action Agreement in January 2020 which installed Papalini as

---

[3] The Court suspects strongly that Joseph did not sign the Motion or the Reply, specifically including the certificates of service on those pleadings signed "under penalty of perjury." A number of documents from the trial, from the bankruptcy proceedings, from pleadings filed in the Tenth Circuit, from pleadings in other districts, and the post-trial motions at ECF Nos. 205 and 206 contain Joseph's actual signature. There are clear differences between the signatures on the Motion and Reply on the one hand and the signatures on these other documents on the other. (*See* Exhibit A.) Additionally, the Court knows from the docket in a matter commenced by Joseph in the U.S. District Court for the Middle District of Pennsylvania (*Joseph v. Warden*, Case No: 3:25-cv-02428-JFS-SA) as well as from the envelopes in which ECF Nos. 205 and 206 were sent to this Court that Joseph has been detained in Pennsylvania during the entire time that the Motion and Reply were prepared and filed. But the tracking numbers on the UPS packages delivering the Motion and Reply to this Court show that these documents were sent directly from Rutland VT following drop-off at a UPS commercial outlet there. That city is one where a Dale Chappell, a non-lawyer and "prison consultant" whose history is known to this Court, has a business according to the web site: Post-Conviction Consulting for Federal and State Cases - Chappell Prison Consulting. And that site also shows ownership of a copyright for "Zen Law Guy, LLC." Although the return address on the packaging for the Motion contains Joseph's Pennsylvania detention facility address, the Reply packaging was not as careful. It bears the return address of "D. Chappell, Zen Law Guy, LLC" of "Rutland VT." If, as suspected, Joseph retained a non-lawyer to use his name and to draft and file something on his behalf by acting as Joseph, both 28 U.S.C. § 1654 and the unauthorized practice of law are implicated. Joseph was clearly aware of these filings as he sought discovery in ECF No. 206 at 3, "so he can prosecute his Rule 33 motion." The Court has considered striking the Motion for the reasons stated. It will not in this instance, but Joseph and others are hereby placed on notice that if others pretend to be Joseph for filing purposes and mimic his signature in future judicial filings, the Court will, at a minimum, strike the filing. Additional action, including referral to the Colorado Office of Attorney Regulation Counsel and others, will also be considered. Finally, the Court advises Joseph that Standard Condition of Supervision No. 8 is currently in effect and that he is required to follow it.

3

Chief Operating Officer ("COO") of SMA. Effectively, Papalini replaced Joseph as the sole officer of SMA, although Joseph remained director, sole shareholder and employee. The Joint Action Agreement gave Papalini sole control of SMA's day-to-day operations and finances and was to remain in effect "until his resignation." This arrangement did not go smoothly.

Joseph and Papalini soon each began to accuse the other of various improprieties. Pertinent to the indictment, in March 2020, Joseph applied for financial relief for SMA under a federally funded COVID program known as the Accelerated and Advance Payment Program ("AAP"). The AAP permitted SMA to receive an advance of Medicare payments to be eventually repaid by offset of future Medicare payments. The application was approved and roughly $86,000 was deposited into SMA's corporate account. Within 24 hours, Joseph transferred $92,000 from that account to one in his minor daughter's name which he controlled. Upon discovery of these events, SMA demanded that the funds be returned to it. Joseph refused. This led to his being terminated by Papalini as medical provider for SMA. He was replaced by a Dr. Wilner.

Later, in June 2020, Joseph applied for funds under another government program, the Paycheck Protection Program ("PPP"), again using SMA as the entity which purportedly needed the funds for the salaries of its employees. Again, the application was approved. This time, however, Joseph had the funds (approximately $179,999) deposited directly into an SMA account which he secretly created and controlled.

The applications discussed above contained various false statements, representations and/or certifications. None of the monies from these programs were used for the purposes required by the programs. And none of the funds were used to pay SMA's employees' salaries or

other SMA obligations. Instead, Joseph used the funds for his own personal benefit – paying personal bills and financing vacation, adult entertainment, and other of his needs and wants.

The factual events surrounding the acquisition and disposition of funds from the AAP and PPP programs were largely uncontested. Instead, the defense centered on whether Joseph had fraudulent intent when he applied. Joseph testified that he did not and that he was simply protecting SMA's funds from misconduct of Papalini. He testified that as director and shareholder of SMA, he was entitled to obtain and utilize the funds notwithstanding (i) the Joint Action Agreement and (ii) a state court order (the "State Order") entered on May 7, 2020, in litigation involving Joseph and Papalini in which the state court denied Joseph's motion for a preliminary injunction against Papalini and preliminarily upheld the Joint Action Agreement and Papalini's authority to replace Joseph as SMA's medical practitioner.[4] To be most clear, the theory of defense was not that Joseph had actual authority to do what he did. Instead, it was that Joseph *believed* that he did and therefore lacked fraudulent intent.

As his counsel put it at the outset of his closing argument:

> Dr. Joseph's beliefs were genuine. There are a few reasons that he is not guilty of these crimes, but none more important than that. His beliefs about his ownership of SMA, his beliefs about his future at SMA, his beliefs about his right to access SMA's accounts and his beliefs about the rules of these federal programs were 100 percent genuine. And a person who operates under a genuine belief that he has done

---

[4] There were two state court Orders received in evidence. The first was the May 7 Order. The second was a later Order of July 23, 2020, which prohibited Joseph from taking various actions with respect to SMA. The July Order was introduced in connection with evidence that later in 2020, Joseph diverted additional Medicare funds belonging to SMA to himself. He used none of that approximately $240,000 (discussed later in this Order) to repay obligations incurred by taking the AAP and PPP program benefit funds. Both Orders were redacted to exclude factual findings. And both were subject to a limiting instruction. The evidence showed that Joseph was aware of the Orders. By limiting instruction, the jury was instructed that it could only consider the Orders on the issue of whether or not Joseph acted with fraudulent intent. The jury was specifically told that these Orders were not the law as determined by this Court or the instructions of the Court.

> nothing wrong is neither a thief nor a person who has devised a scheme to defraud, even if that belief turns out to have been wrong.

(ECF No. 164 at 196-97.) The jury rejected Joseph's honest belief defense and found the necessary fraudulent intent as to the counts of conviction.

### III.    The Bankruptcy Proceedings.

Among the various efforts Joseph undertook to retake control of SMA from Papalini was the initiation of Chapter 11 bankruptcy proceedings in October 2020. *In re Springs Medical Associates P.C.*, No. 20-17026 (Bankr. D. Colo. 2020) (the "Bankruptcy Case"). Originally, Joseph acted as the debtor-in-possession. But after the unexplained disappearance of additional Medicare funds paid to SMA around November 2020 in the approximate amount of $240,000[5], the trustee filed a motion to convert the Bankruptcy Case to a Chapter 7 proceeding with neither Joseph nor Papalini serving as debtor-in-possession or estate representative. (Bankruptcy Case, Doc. No. 45.) The motion to convert was granted. Thereafter, the trustee filed various adversary proceedings against a number of persons and entities, including one against "the Wilner Group," which included Wilner, Papalini and a medical practice they created called "Summit Primary Care PLLC" which ended up in possession of various assets of SMA. *Lofstedt v. Papalini, et al.,* No. 22-01262 (Bankr. D. Colo. 2022) (the "Adversary Proceeding"). The Adversary Proceeding was filed on October 26, 2022.[6]

---

[5] It was later determined – and admitted by Joseph in the bankruptcy proceedings– that Joseph had caused these funds to be paid directly to him as debtor-in-possession and then proceeded to spend the entire amount for his personal benefit over the course of two months. Joseph was held in contempt for these actions and judgment entered against him. (*See,* Bankruptcy Case, Doc. Nos. 56, 68, 76, 92 and 93.) While these latter aspects of the bankruptcy proceedings were not introduced at trial, the facts that Joseph had secured these funds and forwent the opportunity to repay any AAP or PPP funds were introduced for the limited purpose of circumstantially showing proof of Joseph's original intent with respect to his acquisition of the AAP and PPP funds.

[6] The trustee also filed an adversary proceeding against Joseph on April 24, 2023. *Lofstedt v. Joseph.,* No. 23-01102 (Bankr. D. Colo. 2023) (the "Joseph Adversary Proceeding"). The Joseph Adversary Proceeding will be discussed in a later section of this Order.

Some members of the Wilner Group responded to the Adversary Proceeding by filing a motion to dismiss for lack of jurisdiction, alleging that Joseph lacked authority to initiate the underlying Bankruptcy Case out of which the Adversary Proceeding arose and that the trustee was estopped from claiming otherwise. On February 9, 2023, roughly three weeks after the jury's verdict in this matter, the trustee filed a Response (the "Trustee Response") to the Wilner Group's motion. (Adversary Proceeding, Doc. No. 52.) In the Trustee Response, the trustee argued that Joseph had authority to initiate the Bankruptcy Case. On July 12, 2023, the bankruptcy court entered an Order (the "Bankruptcy Order") holding that the bankruptcy court had jurisdiction as Joseph had the power and authority to initiate the bankruptcy process. Various proceedings in the Bankruptcy Case continue to this day.

## IV.    The Motion.

The Motion has been filed pursuant to Rule 33, Fed. R. Crim. P.  More specifically, the Motion was filed under Rule 33(b)(1) asserting that "newly discovered evidence" entitles Joseph to a new trial. The "newly discovered evidence," as described in the Motion, appears to be the *filing* and *docketing* of the Trustee Response and Bankruptcy Order after Joseph's verdict. The Motion argues that these docket entries establish that the "documents relied upon at trial could not transfer ownership as a matter of law" and that the "verdict rests on a factual assumption that is now shown to be false." (Motion at 18.) In short, Joseph argues that these docket entries validated his actions and negated fraudulent intent.

To the extent that there is any uncertainty as to the docket entries themselves being cast as Joseph's "newly discovered evidence," the Reply resolves it. Repeatedly, at every page, Joseph clearly and repeatedly characterizes the "new evidence" as the "post-trial findings" made in the "bankruptcy proceedings." (Reply at 1; *see, generally,* Reply.)

7

### V.    Legal Standard.

Rule 33(a) provides that the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Subsection (b) sets forth the time frame within which a motion for new trial must be filed. Subsection (b)(1) provides:

> (1) *Newly Discovered Evidence.* Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

A motion based on any other grounds must be filed within 14 days after the finding of guilt pursuant to subsection (b)(2) and would be time barred in this case.

In the Tenth Circuit, a Rule 33 motion based on newly discovered evidence "is regarded with disfavor and should only be granted with great caution." *United States v. Quintanilla*, 193 F.3rd 1139, 1146 (10th Cir. 1999). In order to prevail on a Rule 33(b)(1) motion, Joseph must set forth grounds which satisfy the *Sinclair* test, a five-part test for newly discovered evidence outlined in *United States v. Sinclair*, 109 F.3rd 1527, 1531 (10th Cir. 1997) ("*Sinclair*"). Specifically, he must show:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.*

### VI.    Analysis

Before even reaching the *Sinclair* factors, the Motion fails. It does so for either or both of two reasons which flow from the face of the Motion and Reply themselves.

The Motion makes clear that the critical "new" event is the legal ruling that the bankruptcy court makes. It casts this as both a matter of law and as the thrust of the Motion:

8

> The jury's finding of guilt rested on the premise that Dr. Joseph lacked lawful authority and ownership of Springs Medical Associates. The newly discovered evidence establishes that authority and ownership existed **as a matter of law**. (Motion at 9-10, emphasis added.)

> The bankruptcy record supplies a **legal reality** the jury never received. (Motion at 11, emphasis added.)

> [T]he ownership issue appeared as a disputed factual matter entangled with other proceedings, rather than as a **discrete legal question capable of resolution**. (Motion at 11, emphasis added.)

> The documents relied upon at trial could not transfer control **as a matter of law. (**Motion at 18, emphasis added.)

The Reply leans on the bankruptcy proceedings as much as the Motion does. However, in light of the Govt Response's emphasizing the need for there to be newly discovered *factual* evidence, the Reply is more careful in its language. It quietly shifts its description of the "new" evidence to terms more in line with findings of fact:

> The bankruptcy proceedings produced post-trial findings establishing that Dr. Joseph owned and controlled Springs Medical Associates, evidence that requires a new trial. (Reply at 1.)

> The bankruptcy findings arose after trial through the trustee's investigation into the corporate structure and authority of the practice. Because the jury never saw that evidence, presenting it now cannot constitute relitigation. (Reply at 2-3.)

Whichever characterization is accepted, the Motion fails.

If the Motion's emphasis is on a legal ruling made by the bankruptcy court, then the Motion does not rely on factual evidence, newly discovered or otherwise. At its core, the Motion argues that a bankruptcy court judge has "ruled" that Joseph had the right to control day-to-day operations of SMA, including its finances, and that therefore Joseph's actions could not be fraudulent.

In the Motion, Joseph presents the Bankruptcy Order (as construed by him) as creating law which Joseph considers to be binding on the district court and which he believes affords him a new defense on the issue of fraudulent intent. But if so viewed[7], then Joseph seeks a new trial on the basis of new, clarified or emergent *law* – not on the basis of *factual, historical evidence*. Indeed, the underlying documents and events on which the Bankruptcy Order relied are all matters which existed and were known by Joseph prior to his criminal trial. It is only the Bankruptcy Order itself and its assumed legal holdings and binding nature which are cast as "new."

Rule 33 is not a mechanism for arguing legal theories post-conviction. That is what an appeal is for. Joseph had every opportunity to argue this "law" in his direct appeal or even in post-conviction proceedings. Both the Trustee Response and the Bankruptcy Order predate the filing of Joseph's opening brief in the Tenth Circuit by months. Yet no argument was ever made in his initial appeal that this Court erred in failing to invalidate the government's position as a matter of law.[8] Nor has any § 2255 petition been filed with respect to the propriety of his actual defense.[9] What Joseph truly seeks is an opportunity to abandon his original defense and try a new, law-based one – that he was in fact acting within his legal rights, a defense neither relied upon at trial nor raised on appeal. And using the "newness" of the Bankruptcy Order, Joseph

---

[7] Bankruptcy court interpretations of law are not binding on the district court. And if viewed as some species of estoppel on the government, any suggestion of a binding effect still fails. A later in time Bankruptcy Order obviously could not estop the government in an earlier proceeding from arguing that Joseph engaged in fraud. Temporal matters aside, the Adversary Proceeding and criminal case involved different parties and different issues – whether Joseph had authority to initiate bankruptcy proceedings versus whether he engaged in fraudulent acquisitions of government program funds.

[8] Joseph did attempt to raise one issue discussed in the Motion in his Rehearing Petition. Specifically, Joseph questioned the lawfulness of Papalini's authority under "Colorado Corporate Practice of Medicine (CPOM) law." Rehearing Petition at 4. But by this time, it was too late. He waived the issue by failing to raise it in his original briefing. And the Rehearing Petition was denied. Subsequent attempts to raise the matter in his petition for certiorari were equally unsuccessful.

[9] This statement should not be interpreted as a suggestion that the Court is soliciting a § 2255 petition or that, if such a petition is filed, it would likely be granted.

10

tries to achieve his goal of obtaining a trial mulligan by using Rule 33 and by labeling perceived new law as new evidence.

This Court views the matter before it with the same mindset as that of the Sixth Circuit in *United States v. Olender*, 338 F.3d 629 (6th Cir. 2003) ("*Olender*"). There, the Sixth Circuit reviewed a district court order which had denied a Rule 33 motion on the basis that:

> Newly discovered evidence does not include new legal theories or new interpretations of the legal significance of the evidence. See *United States v. Seago,* 930 F.2d 482, 489 (6th Cir.1991). "Evidence will not be deemed 'newly discovered' simply because it appears in a different light under a new theory. [A] party who desires to present his case under a different theory [i]n which facts available at the original trial now first become important, will not be granted a new trial." *United States v. Hamling,* 525 F.2d 758, 759 (9th Cir.1975). An attempt to relitigate the case on a new theory is not considered newly discovered evidence but is merely newly discovered issue of law. *United States v. Shelton,* 459 F.2d 1005, 1006–07 (9th Cir.1972).

(*Olender* at 635-36.) The Sixth Circuit affirmed, finding "no error in the denial of Olender's motion for new trial …." *Olender* at 636.

Denial on this basis is particularly appropriate here where the legal theory was as discernable at the time of the original trial as it is now. Joseph simply pursued a different theory of defense then and now wants to alter that selection. The interest of justice does not require a new trial where Joseph's original theory of defense was unsuccessful in a full and fair trial, but Joseph now wants to see whether a new theory would prove to be any more successful.

In the Govt Response, the government recognized this and correctly noted that "Rule 33 is concerned with the discovery of new historical facts, not subsequent legal conclusions." (Govt Response at 3.) Thereafter, in the Reply, Joseph ceased describing the Motion's basis as a matter

of law and shifted to labeling the "newly discovered evidence" as the development of findings of fact. The shift is noticeable, and ineffective. All it does is substitute one deficiency for another.

The alternative reason that the Motion fails at the outset is that to the extent it casts the bankruptcy ruling as constituting factual determinations not previously existing, then it purports to rely on "evidence" which did not exist at the time of the criminal trial. Aware that the underlying facts and records on which the Bankruptcy Order was based were known to him prior to his criminal trial[10], Joseph - at times in the Motion and consistently in the Reply - attempts to avoid a negative consequence by casting the actual filing and docketing of the Trustee Response and Bankruptcy Order as his "newly discovered evidence":

> This evidence did not exist at the time of trial. Dr. Joseph could not have discovered it earlier through diligence. The bankruptcy court's rulings post-date the criminal proceedings …

(Motion at 3.)

> The bankruptcy trustee examined the governing documents, financial records, and corporate authority of the practice. That investigation resolved the ownership question and determined that Dr. Joseph retained legal ownership and authority over the practice. Those findings arose after the criminal trial and were never presented to the jury.

(Reply at 2.)

The difficulty for Joseph is that the Tenth Circuit has stated that "[a]s a general rule, 'newly discovered evidence' must have been in existence at the time of trial." *United States v. Abello-Silva*, 107 F.3d 22, at \*2 (10th Cir. Feb. 20, 1997) (citing *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993)). More recently, the United States Court of Appeals for the District of Columbia Circuit addressed the same issue. That is, "whether 'evidence' that does not

---

[10] Prior to trial, Joseph attached to his trial brief the complaint in the Adversary Proceeding and sought to have the Court rely upon its allegations as background for the events leading to his prosecution. (ECF No. 92-6.)

exist until after trial can be 'newly discovered evidence' under [Rule 33(b)(1)]." *United States v. Hall*, 324 F.3d 720, 723 (D.C. Cir. 2003). That court concluded that it could not.

This Court views the matter similarly. If nothing then existing was unavailable at the time of the original trial and all that was discoverable at that time was known, then the interest of justice does not now require a new trial. The original trial was both full and fair.

Notwithstanding the fact that these matters are determinative, the Court, in the interest of completeness, still turns to the *Sinclair* factors. The Motion fails to satisfy four of those five factors as well.

> **i.    The evidence, reasonably interpreted, was not first discovered after trial.**

As noted above, if the "evidence" was discovered only after trial because it did not exist prior to trial, the Motion fails. But what if the Court focuses not on the issuance and filing of the Trustee Response and the Bankruptcy Order but instead on the underlying facts and/or law used and recited by the trustee in making her argument and by the bankruptcy court as the basis for issuing its Bankruptcy Order? The Motion still fails.

The Trustee Response is based on various exhibits attached to that response as Exhibits A through K. Each is either (i) an SMA document authorized or executed by Joseph when SMA was formed or when the Joint Action Agreement was entered into or (ii) an early pleading from the Bankruptcy Case. Joseph was aware of all of it. He initiated the Bankruptcy Case, filed various pleadings and documents in that case, and referred this Court to the Adversary Proceeding in his trial brief. The Bankruptcy Order relies on the same documents and pleadings as the Trustee Response.

Joseph does not point to a single fact, document, statute or other basis for the Bankruptcy Order that was not fully known to him at the time of his criminal trial. In terms of the documents,

facts and events which are actually "evidence," all of it was known and discovered by Joseph before his criminal trial. He cannot contend otherwise. That is why Joseph contorts reality in trying to convince the Court that it is not the facts, but the utilization of the facts by the trustee and the bankruptcy court, which constitutes the evidence.

Joseph does not ever establish that he could not have utilized the facts in the same way as the trustee and bankruptcy judge, either by making legal argument to this Court or tendering proper evidence at trial. The later analysis of pre-existing and known facts, whether by the trustee or the bankruptcy court, is not "new evidence" only discoverable after the Trustee Response and Bankruptcy Order were first written. *See, United States v. Rodella,* 2015 WL 711931 at *30-31 (D.N.M. Feb.2, 2015) (evidence consisted of earlier medical records – not subsequent letter or opinion discussing same).

The Motion fails under the first Sinclair factor.

### ii. The failure to learn of the evidence was caused by Joseph's lack of diligence.

As noted, the actual "evidence" was known to Joseph before trial. But Joseph claims that he lacked the pieces of paper from the bankruptcy court which, he claims, agrees with his allegation that he was entitled to take AAP and PPP money from government programs and spend it on himself. That construction of the "evidence" is specious in the view of this Court.

Nonetheless, what if the argument, opinion or views of the trustee, which ultimately came to be accepted by the bankruptcy court, did somehow matter in the criminal case? If so, then the failure to learn of this "evidence" was due to Joseph's lack of diligence. He knew of the Bankruptcy Case. He initiated it. He followed the Adversary Proceeding. He submitted the complaint from that proceeding to this Court. He knew by the time of trial that bankruptcy proceedings had been ongoing for years. If there was any question as to whether the trustee

14

opined that Joseph had authority to initiate the Bankruptcy Case, he could have simply asked. But there is no evidence that he did or even tried to do so. Certainly, no subpoena was sought.

The limited and actual meaning of the Bankruptcy Order - that Joseph had authority to initiate the Bankruptcy Case - was also knowable (relevance aside) prior to the criminal trial had Joseph been diligent in the slightest. On December 29, 2020, Papalini filed objections in the Bankruptcy Case to the Trustee's motion to convert the proceedings from Chapter 11 to Chapter 7. As part of those objections, Papalini stated that "Papalini disagrees that a Chapter 11 was appropriately filed in the first instance." (Bankruptcy Case, Doc. No. 50 at 4.) At a January 22, 2021, hearing attended by Joseph through counsel, the bankruptcy judge overruled Papalini's objections and converted the bankruptcy proceedings from Chapter 11 to Chapter 7. (*See* Adversary Proceeding, Doc. No. 52-8.)

To the extent that Joseph seeks to attach some importance to the trustee's viewing Joseph as the "owner" of SMA, Joseph characterization of this view as only crystalizing post-trial is both myopic and incredible. In the Bankruptcy Order which Joseph relies on, the bankruptcy judge specifically quotes earlier pleadings which Joseph conveniently chooses to ignore.

> On December 8, 2020, the United States Trustee filed his *United States Trustee's Motion to Dismiss or Convert* (the "UST Motion," docket #45 in the SMA Case), asserting "neither the Debtor's owner (Dr. Joseph) nor the Debtor's Chief Operating Officer (Mr. Papalini) appears to be in a position to carry on as the representative of the Debtor in this case."

(Bankruptcy Order at 4.)

It is clear that to the extent the positions taken by the trustee and the bankruptcy judge in the Trustee Response and in the Bankruptcy Order are considered "evidence," these positions were forecast, if not stated, long in advance of Joseph's criminal trial. Any failure to discover such "evidence" by Joseph is thus considered the consequence of his lack of diligence.

15

Finally, regardless of whether considered law or fact, any proper characterization of the rights and authority of a shareholder or director with respect to bypassing officers and accessing corporate bank accounts for oneself was always available to Joseph by retaining any corporate law attorney or other qualified individual to act as an expert. Unsurprisingly, none was called as the trial defense focused on "belief" and not actual authority. But to the extent Joseph believes that he should now be permitted to change his theory of defense, he fails to explain why an actual authority defense could not have been discovered and presented in the first instance.

The Motion fails under the second *Sinclair* factor.

### iii.    The new evidence is not merely impeaching.

Whatever characterization of the "new evidence" is applied, the Court will assume that it is not offered merely for impeachment of any particular witness. Although evidence which merely corroborates the testimony of others (Joseph) is, in some ways, not materially different from evidence which merely impeaches a government witness, the Court will conclude that this *Sinclair* factor is not an impediment to the Motion. In fairness, however, the Court notes that the Govt Response argues that the evidence can only be impeaching as there is no way that any post-trial events could be admitted on the substantive issue of Joseph's earlier intent. While not wrong, the Court's examination of the record fails to identify a government witness who would clearly be "impeached."[11]

### iv.    The new evidence is not material to the principal issues involved.

Joseph's new evidence is neither material nor relevant to the case that actually proceeded to trial. It might have been material to Count Four of the indictment – bankruptcy fraud – as that

---

[11] Some witnesses spoke the words "director" or "shareholder." However, as near as the Court has been able to determine, when these words were used in connection with SMA, the witnesses were mostly quoting or recalling statements made by Joseph.

Count alleged that Joseph initiated the Bankruptcy Case without authorization. But that Count was dismissed before trial. After its dismissal, the bankruptcy proceedings played only a very minimal trial role. Joseph acquired (and personally kept) $240,000 in additional Medicare funds from the government while acting as debtor-in-possession and did not use any of it to repay the earlier AAP and PPP advances. The jury was permitted to use that failure in determining whether Joseph had previously acted with fraudulent intent in acquiring the AAP and PPP benefit funds.

Joseph, however, wants to make the legitimacy of the certain bankruptcy filings themselves be material evidence on the Counts which actually went to trial. It is only his gross mischaracterization of the actual trial evidence and creative use of quotations which even arguably makes this appear material.[12]

Contrary to Joseph's characterization of the Trustee Response and the Bankruptcy Order, neither purports to opine, argue or hold that Joseph was properly in control of all day-to-day operations and finances of SMA during the time periods relevant to the criminal prosecution. Nor does either claim that a director or shareholder can bypass the corporate structure and simply take what he wants from a corporation whenever he wants it. Neither argues that the Joint Action Agreement, state court orders, or Joseph's criminal conviction was or is in any way tied to the singular issue before the bankruptcy court. All that the trustee argued and all that the bankruptcy judge found was that Joseph had authority to initiate bankruptcy proceedings. He had such authority because, as a matter of Colorado law, only directors – not officers such as COOs like Papalini – have authority to initiate bankruptcy proceedings. And Joseph remained the director of

---

[12] At times, Joseph clips his quotations - omitting critical portions. In other instances, he simply invents quotations that do not appear in the Trustee Response or the Bankruptcy Order. As one example of the latter, at page 8 of the Motion, Joseph quotes the Trustee Response as stating that Papalini ""could never legally hold ownership or control of SMA." BANKR. ECF No. 52 at 3-4." No such quotation appears at pages 3-4 or anywhere in the Trustee Response.

SMA even after the Joint Action Agreement and the State Order.

> State law determines whether a bankruptcy petition is filed by a person with proper authority. *Yellow Cab Coop. Ass'n v. Mathis*, 144 B.R. 505 (D.
>
> Colo. 1992). In Colorado, only a board of directors has the authority to file a petition or authorize its filing. *Id.* Here, Joseph was SMA's only director.

(Bankruptcy Order at 7.)

The language of the Trustee Response is to the same effect. The matters which Joseph views as intertwined with the counts of conviction are not:

> Dr. Joseph's conviction for theft of government benefits and wire fraud has nothing to do with whether the Colorado law gave Dr. Joseph the authority to commence the underlying bankruptcy case.

(Trustee Response at 3.)

Joseph attempts to create some connection by claiming that his role as shareholder or director was both critical to the criminal prosecution and hotly contested. There is little truth to this claim. Nor is there any truth to the claim that the Trustee Response or the Bankruptcy Order somehow suggested that the Joint Action Agreement or the State Order was invalid, void, or ineffective with respect to the matters addressed in them. As the prior quotations demonstrate, the Adversary Proceeding involved an entirely different issue and legal argument.

As noted earlier, one aspect of the claim made by the Wilner Group in the Adversary Proceeding in an attempt to ward off a finding of proper authority was to argue that the trustee was collaterally estopped from contending that Joseph had authority to initiate bankruptcy proceedings in light of the Joint Action Agreement, state orders and criminal conviction. The Bankruptcy Order made clear that this estoppel claim did not apply as neither the Joint Action Agreement, the state orders nor the conviction involved or addressed the authority of a director to initiate bankruptcy. The Bankruptcy Order focused on that limited issue, It did not, as

18

suggested by Joseph, conclude that the Joint Action Agreement, any state order or the conviction was invalid, or involved misapplications of law. It said simply:

> And, most importantly, the issue to be precluded – whether SMA's bankruptcy case was properly filed – was not determined in any prior civil or criminal proceeding, as required by [the collateral estoppel doctrine]. Nothing in the Joint Action Agreement, the State Court Orders, or Joseph's criminal conviction resulted in Joseph being removed from, or Papalini being appointed to, SMA's board of directors. No State Court civil or criminal order held Joseph was not an SMA director. No order prevented Joseph from exercising his authority as director to authorize a bankruptcy filing. No order addressed or made any finding as to Joseph's authority to file a bankruptcy case on behalf of SMA, and no order prevented Joseph from filing the SMA Case.

(Bankruptcy Order at 8.)

Although not discussed by Joseph for obvious reasons, other aspects of the bankruptcy proceedings clearly demonstrate that those proceedings never challenged the validity of the Joint Action Agreement or the State Order or their impact on Joseph. Among the several adversary proceedings initiated by the trustee was the Joseph Adversary Proceeding. The Complaint in that proceeding described the Joint Action Agreement and the state court orders and alleged that, as a consequence of these matters, "Papalini remained in control of SMA" and Joseph was "effectively enjoined" from running SMA. Joseph Adversary Proceeding, Doc. No. 1 at 3-4. And among the monies which the Joseph Adversary Proceeding sought to recover from Joseph for the benefit of the bankruptcy estate were the AAP funds[13] removed directly from SMA's corporate bank account by Joseph. Those funds are the same as those which were the subject of Count One in the criminal prosecution. Judgment on the Joseph Adversary Proceeding entered against Joseph on October 2, 2023. (Joseph Adversary Proceedings, Doc. No. 12.)

---

[13] Not only was the fund transfer characterized as an avoidable transfer for Joseph's personal benefit, it was also characterized as having been made with "fraudulent intent" – in that court, the relevant fraud being that it was intended to keep the funds from SMA creditors. *See*, Joseph Adversary Proceeding, Doc. No.1.

Shifting the focus back to the criminal trial, Joseph mischaracterizes that as well. Contrary to his contentions, the government's case did not depend "on a single, essential theory: Dr. Joseph was not the legal owner of SMA during the charged conduct." (Motion at 2.) The government's trial theory did not even require this.

The government did not charge Joseph with wrongly acquiring SMA's property. Counts One and Three of the indictment alleged conduct which was fraudulent with respect to the acquisition of government relief program funds. Those funds could be (and were) fraudulently acquired regardless of Joseph's status with SMA.

During the trial, Joseph repeatedly testified that he was the director and sole shareholder of SMA during the operative time period. (*See generally*, ECF No. 164 at 12-143.) The government did not challenge that status on cross-examination. It did not thereafter argue director or shareholder status to the jury. (*See* Closing Arguments, ECF No. 164 at 221-31.) In fact, on the few occasions that these words were uttered by government witnesses at trial, it typically was where a witness was reading an exhibit or explaining what Joseph had said on prior occasions. The government proved fraudulent intent by focusing not on whether Joseph was a director or shareholder, but primarily on Joseph's transfer of day-to-day control and finances to Papalini, on his subsequent misrepresentations and false statements in the AAP and PPP applications and to fund providers, on his manner of moving funds, on his use of funds solely for personal benefit, and on additional matters. As the Tenth Circuit observed, "Robust direct and circumstantial evidence exists to support Joseph's convictions on both counts." (ECF No. 182 at 9.) The entire premise of the Motion is a strawman created by Joseph.

Most importantly, as to the actual trial, as the Govt Response notes, 2023 arguments and rulings in a bankruptcy case cannot have influenced Joseph's intent with respect to actions taken

20

in 2020 when he fraudulently obtained government relief program funds. Indeed, even if a stipulation that Joseph was the shareholder and director of SMA had been explicitly agreed to at trial, he could still have been found guilty of fraud based on the trial evidence. After all, he was convicted despite his testimony as to these matters. His misrepresentations and false certifications in applications themselves were strong evidence of fraudulent intent. As but one example, the Tenth Circuit noted that Joseph's AAP application was allegedly necessary "due to billing complications;" however, "[n]otably, evidence presented at trial suggests no such complications were present at the time Joseph submitted his request." (Joseph Opinion, ECF No. 182 at 5.)

The "new evidence" described by Joseph does not satisfy the materiality requirement. The Motion fails to satisfy the fourth *Sinclair* factor.

### v.    The new evidence is not of such a nature that in a new trial, it would probably produce an acquittal.

The Court concludes that the Motion fails to satisfy the final *Sinclair* element as well. This is true regardless of how Joseph's "new evidence" is construed.

If the "new evidence" is construed, properly, as simply a determination by the bankruptcy court and trustee that the authority to initiate bankruptcy proceedings rests with corporate directors, not officers, as a matter of Colorado law, then that evidence would not probably produce an acquittal. Such evidence is and would be completely irrelevant to the criminal charges that went to trial. It would likely not even be admitted at trial – much less probably result in an acquittal.

If the "new evidence" is additional evidence that Joseph remained a director and shareholder of SMA after the Joint Action Agreement and State Order, it would not probably result in an acquittal if introduced in a new trial. Such evidence would merely be cumulative.

21

These facts were already introduced in the original trial through corporate documents and Joseph's testimony. Neither the Joint Action Agreement nor the State Order said that Joseph was not a director or shareholder. The prosecution was not primarily dependent on evidence or argument that Joseph was not a director or shareholder.[14] Still, Joseph was found to be guilty.

If Joseph's unchallenged testimony about his role and status as a director and shareholder did not preclude guilt, it cannot be the case that presenting cumulative evidence on this issue would "probably" produce an acquittal. The outcome would not "probably" be different if such facts were introduced in a new trial simply in a different or additional form.

If the "new evidence" is purportedly the alleged "fact" or determination of the bankruptcy court that Joseph was entitled to take government money intended for SMA's business and use it as his personal funds, that evidence would not be admitted at trial. It is a clear misinterpretation of the Trustee Response and Bankruptcy Order. The Court is not obligated to allow Joseph to present patently inaccurate characterizations of the bankruptcy proceedings at trial in order to deceive a jury.

Finally, to the extent that Joseph sees the outcome of the bankruptcy proceedings as creating some law that would bind the district court in its rulings in a new trial, he is simply wrong. The Court would not be bound in the criminal case to follow a legal conclusion in an unrelated Order of a bankruptcy court. And Joseph's view of the law as permitting a director or shareholder to use the corporate entity to acquire government relief program funds intended for specified corporate uses and to use the funds instead as his own personal property is delusional, especially for one, like Joseph, holding both a juris doctorate and MBA degree.[15] He would have the law treat SMA as a separate and distinct corporate entity for debt elimination in bankruptcy

---

[14] As noted, neither term even appears in the government's closing argument.
[15] Joseph has reported a juris doctorate (unaccredited) in 2008 and his MBA (remote) in 2021. (ECF No. 141 at 16.)

while simultaneously treating the corporate structure as a sham in order to avoid Joseph's criminal liability. This Court would not engage in such gamesmanship. Joseph would not "probably" be acquitted if he made such a claim to this Court "as a matter of law" or otherwise – with or without the Bankruptcy Order. Joseph grossly contorts the rights of shareholders and directors when he views them as legally able to disregard the corporate structure on a whim. He fails to satisfy this *Sinclair* factor as well.

**VII.    Conclusion.**

Joseph takes the contents of a child's beach pail and declares that he has found the Sahara. He has not. Exaggeration and mischaracterization are not bases for relief. Neither the Trustee Response nor the Bankruptcy Order are as Joseph describes them. Neither provides a basis for a new trial in the interest of justice. For all of the reasons set forth above, the Court finds the Motion to be wanting. Joseph was fairly tried and convicted. Relief from his just convictions through a new trial is not warranted. In the exercise of its discretion, the Court declines to Order that such a new trial occur.

Accordingly,

IT IS HEREBY ORDERED:

That the Motion (ECF No. 202) is DENIED.

DATED this 16th day of March, 2026.

BY THE COURT:

RAYMOND P. MOORE
Senior United States District Judge

**EXHIBIT A**
**"JOSEPH" SIGNATURES**

**Suspect Signatures (Among Other Things, Pen Lifted)**

The Motion:                                        The Reply:

Francis Joseph # 25 04143
Pike County Correctional Fa
175 Pike County Road

Francis Joseph # 25 04143
Pike County Correctional Facili
175 Pike County Road

**Authentic Signatures (Among Other Things, Pen Never Lifted)**

ECF 205:                                           ECF 206:

Francis Joseph #25 04143
Pike County Correctional Facility
175 Pike County Road
Lords Valley PA 18428

e so he can prosecute his Rule 33 motion.

Francis F Joseph
Defendant

10th Circuit:                                      Bankruptcy Court:

Respectfully Submitted,

Francis F. Joseph
9/4/24

Francis Joseph MD

M.D. Pa. (25 Case):                               M.D. Pa. (24 Case):

Signature of Petitioner

Signature of Petitioner

Joint Action Agreement:                           Colo. Financial Affidavit:

ify under penalty of perjury that the foregoing is tr

Sole Director

SIGNATURE OF DEFENDANT
(OR PERSON SEEKING REPRESENTATION)

24