**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Raymond P. Moore**

Criminal Case No. 21-cr-00083-RM
Civil Action No. 26-cv-03015-RM

UNITED STATES OF AMERICA,

Plaintiff/Respondent,

v.

FRANCIS F. JOSEPH,

Defendant/Movant.

---

**REISSUED ORDER DENYING 28 U.S.C. § 2255 MOTION[1]**

---

This matter is before the Court on the *pro se* motion of Defendant/Movant ("Joseph") captioned as "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (ECF No. 219, hereinafter the "Motion"). The Court has considered the Motion, the Memorandum in Support (ECF No. 223, hereinafter the "Memorandum"), and the United States' Opposition to Defendant's Motion Under 28 U.S.C. § 2255 (ECF No. 231, hereinafter the "Response"). Joseph was allowed to file a reply within thirty (30) days of the filing of the Response. (*See* ECF No. 222 at 1.) The time for filing a reply has passed, and no reply has been filed. The Court has also reviewed the docket generally and other additional

[1] On October 15, 2026, the Court issued an Order in this matter (ECF No. 233) and Judgment entered (ECF No. 234). On the following day, the Tenth Circuit Court of Appeals issued the mandate in *United States v Joseph*, Case No. 26-1295, Doc. No. 11 (10th Cir. Oct. 16, 2026) (ECF No.235). That appeal was an interlocutory appeal by Joseph challenging an Order of this Court denying his motion to recuse. The Tenth Circuit had earlier concluded that it did not have jurisdiction in the interlocutory appeal. *United States v Joseph*, Case No. 26-1295, Doc. No. 7-1 (10th Cir. Aug. 24, 2026). Nonetheless, the mandate advised that "jurisdiction is transferred back to the lower court." In order to avoid any issue with respect to its October 15, 2026, Order, this Court reissues its Order anew as of this date and directs that a new Judgment enter. Apart from the title, this footnote, the date, and a direction to the Clerk of the Court in the Conclusion, the prior and the reissued Orders are identical.

pleadings and judicial rulings as identified herein. Having reviewed the foregoing and given the Court's overall familiarity with this matter as the trial court, the Motion is DENIED for the reasons set forth below.

## I. Procedural Background.

On March 17, 2021, a four-count indictment was returned charging Joseph with theft, embezzlement and conversion of health care benefit funds in violation of 18 U.S.C. § 669 (Count One); theft, embezzlement and conversion of government property in violation of 18 U.S.C. § 641 (Count Two); wire fraud in violation of 18 U.S.C. § 1343 (Count Three); and false statements in bankruptcy proceedings in violation of 18 U.S.C. § 152(3) (Count Four). The government voluntarily dismissed Count Four in advance of the trial date, and Joseph went to trial on the remaining three counts on January 9, 2023. On January 13, 2023, the jury returned verdicts of "guilty" on Counts One and Three and of "not guilty" on Count Two. Joseph was sentenced on June 1, 2023, to concurrent imprisonment terms of 30 months on the counts of conviction, together with supervised release and restitution. Judgment entered on June 5, 2023.

Joseph appealed his convictions to the U.S. Court of Appeals for the Tenth Circuit. Appellate counsel ("Appellate Counsel")[2] raised seven issues, six trial related and one sentencing related. On July 29, 2024, the Tenth Circuit affirmed Joseph's convictions as well as his sentence. (*United States v. Joseph*, 108 F.4th 1273 (10th Cir. 2024) (hereinafter the "Joseph Opinion").) Thereafter, on October 31, 2024, Joseph filed a *pro se* petition for rehearing. (*United*

[2] Appellate Counsel differed from Joseph's trial counsel (hereinafter "Trial Counsel"). At trial, Joseph was represented by the Office of the Federal Public Defender. On appeal, the Federal Public Defender initially continued to represent Joseph. However, on August 14, 2023, retained counsel (Elizabeth Franklin-Best) entered her appearance for Joseph. She authored the appellate briefs and remained Joseph's counsel until shortly after the Tenth Circuit's Opinion issued in the direct appeal in this matter. Then, on August 21, 2024, she moved to withdraw at Joseph's request. Joseph thereafter continued in a *pro se* capacity for the remainder of the proceedings before the Tenth Circuit. The term "Appellate Counsel" refers to Franklin-Best.

*States v Joseph*, Case No. 23-1192, Doc. No. 115-1 (10th Cir. Oct. 31, 2024) (hereinafter the "Rehearing Petition").) The Circuit denied that petition on November 25, 2024.

On March 19, 2025, after having been granted an extension, Joseph filed a *pro se* petition for writ of certiorari with the U.S. Supreme Court. (*United States v. Joseph*, Case No. 24-7305, Petition for Writ of Certiorari (U.S. Mar. 19, 2025) (hereinafter the "Certiorari Petition").) This petition was denied on June 30, 2025. (*United States v Joseph*, Case No. 23-1192, Doc. No. 132 (10th Cir. Jul. 2, 2025).)

On January 13, 2026, Joseph filed in this Court a Motion for New Trial Pursuant to Rule 33, Fed.R.Crim.P. (ECF No. 202, hereinafter the "New Trial Motion.") It was denied by this Court's Order of March 16, 2026. (ECF No. 209.) On April 3, 2026, Joseph appealed the denial of the New Trial Motion. That appeal remains pending. (*United States v Joseph*, Case No. 26-1106 (10th Cir.).)

On July 2, 2026, Joseph filed the Motion and the Memorandum in this Court. The Motion was signed and notarized on June 23, 2026. The envelope in which it was mailed bears a stamp of the detention facility where Joseph is currently detained and postage dated June 29, 2026.[3]

On September 8, 2026, the government filed the Response. The Response opposes each ground for relief asserted by the Motion and the Memorandum.

**Factual Background.**

What follows is a description of the factual background based on the trial evidence as previously set forth in this Court's Order Denying Motion for New Trial (ECF No. 209):

[3] Joseph has completed service of his sentence of imprisonment. Upon completion, he was taken into custody by immigration authorities. Joseph is a citizen and national of India who acquired lawful permanent resident status on August 13, 2004. However, an Order of Removal has been issued by an immigration judge, and Joseph is currently engaged in habeas and related proceedings in the Middle District of Pennsylvania with respect to his immigration issues. He is being held in Pike County Correctional Facility in Lords Valley, Pennsylvania.

"The Joseph Opinion contains a summary of the facts established at trial. It is incorporated herein by reference. Nonetheless, in order to provide context for this Order, the Court sets forth the following brief description of the facts pertaining to the counts of conviction.

Joseph was the founder, sole shareholder, sole officer, and sole director of a business entity and medical practice called Springs Medical Associates P.C. ("SMA") formed in 2014. In the 2019/2020 timeframe, SMA was undergoing financial difficulties and sought to resolve them by borrowing money from an entity named Equitifirst Funding which was owned and controlled by Eric Papalini ("Papalini"). As part of the funding arrangement, Joseph – as director and shareholder – executed a Joint Action Agreement in January 2020 which installed Papalini as Chief Operating Officer ("COO") of SMA. Effectively, Papalini replaced Joseph as the sole officer of SMA, although Joseph remained director, sole shareholder and employee. The Joint Action Agreement gave Papalini sole control of SMA's day-to-day operations and finances and was to remain in effect "until his resignation." This arrangement did not go smoothly.

Joseph and Papalini soon each began to accuse the other of various improprieties. Pertinent to the indictment, in March 2020, Joseph applied for financial relief for SMA under a federally funded COVID program known as the Accelerated and Advance Payment Program ("AAP"). The AAP permitted SMA to receive an advance of Medicare payments to be eventually repaid by offset of future Medicare payments. The application was approved and roughly $86,000 was deposited into SMA's corporate account. Within 24 hours, Joseph transferred $92,000 from that account to one in his minor daughter's name which he controlled. Upon discovery of these events, SMA demanded that the funds be returned to it. Joseph refused. This led to his being terminated by Papalini as medical provider for SMA. He was replaced by a Dr. Wilner.

Later, in June 2020, Joseph applied for funds under another government program, the Paycheck Protection Program ("PPP"), again using SMA as the entity which purportedly needed the funds for the salaries of its employees. Again, the application was approved. This time, however, Joseph had the funds (approximately $179,999) deposited directly into an SMA account which he secretly created and controlled.

The applications discussed above contained various false statements, representations and/or certifications. None of the monies from these programs were used for the purposes required by the programs. And none of the funds were used to pay SMA's employees' salaries or other SMA obligations. Instead, Joseph used the funds for his own personal benefit – paying personal bills and financing vacations, adult entertainment, and other of his needs and wants.

The factual events surrounding the acquisition and disposition of funds from the AAP and PPP programs were largely uncontested. Instead, the defense centered on whether Joseph had fraudulent intent when he applied. Joseph testified that he did not and that he was simply protecting SMA's funds from misconduct of Papalini. He testified that as director and shareholder of SMA, he was entitled to obtain and utilize the funds notwithstanding (i) the Joint Action Agreement and (ii) a state court order (the "State Order") entered on May 7, 2020, in litigation involving Joseph and Papalini in which the state court denied Joseph's motion for a preliminary injunction against Papalini and preliminarily upheld the Joint Action Agreement and Papalini's authority to replace Joseph as SMA's medical practitioner.[4] To be most clear, the

[4] There were two state court Orders received in evidence. The first was the May 7 Order. The second was a later Order of July 23, 2020, which prohibited Joseph from taking various actions with respect to SMA. The July Order was introduced in connection with evidence that later in 2020, Joseph diverted additional Medicare funds belonging to SMA to himself. He used none of that approximately $240,000 (discussed later in this Order) to repay obligations incurred by taking the AAP and PPP program benefit funds. Both Orders were redacted to exclude factual findings. And both were subject to a limiting instruction. The evidence showed that Joseph was aware of the Orders. By limiting instruction, the jury was instructed that it could only consider the Orders on the issue of whether or not Joseph acted with fraudulent intent. The jury was specifically told that these Orders were not the law as determined by this Court or the instructions of the Court.

theory of defense was not that Joseph had actual authority to do what he did. Instead, it was that Joseph *believed* that he did and therefore lacked fraudulent intent.

As his counsel put it at the outset of his closing argument:

> Dr. Joseph's beliefs were genuine. There are a few reasons that he is not guilty of these crimes, but none more important than that. His beliefs about his ownership of SMA, his beliefs about his future at SMA, his beliefs about his right to access SMA's accounts and his beliefs about the rules of these federal programs were 100 percent genuine. And a person who operates under a genuine belief that he has done nothing wrong is neither a thief nor a person who has devised a scheme to defraud, even if that belief turns out to have been wrong.

(ECF No. 164 at 196-97.) The jury rejected Joseph's honest belief defense and found the necessary fraudulent intent as to the counts of conviction."

## II. The Motion.

The Motion was filed in this Court after expiration of the one-year period within which 2255 petitions must be filed under 28 U.S.C. 2255(f). The window for filing closed after June 30, 2026 – the one-year anniversary of the denial of the Certiorari Petition. Technically, the Motion does not strictly comply with all aspects of the prison mailbox rule. However, as there is clear evidence that the Motion was signed, provided to officials at Joseph's detention facility, and mailed prior to the closing of the one-year filing period, the Court applies the rule and considers the Motion to be timely. The government does not contend otherwise.

The Motion purports to raise seven grounds for relief. As stated in the Motion, they are: (i) ineffective assistance of Trial Counsel, (ii) ineffective assistance of Appellate Counsel, (iii) denial of choice of counsel, (iv) improper jury instructions, (v) judicial bias, (vi) cumulative error, and (vii) Batson challenge. However, in the Memorandum, the grounds are somewhat different. The Batson challenge is not a separate ground for relief, but rather a component of the alleged ineffective assistance of Trial and Appellate Counsel. The "sixth" ground for relief (with

cumulative error being pushed down to the seventh) is instead said to be "Failure to give proper jury instructions and flaming (sic) the jury." As there are no factual recitations in the Motion, the Court will proceed with the grounds as stated in the Memorandum in the order there presented.

The third through seventh grounds for relief are, for the most part, single issue or single basis claims; the ineffective assistance of counsel claims are not. With respect to Trial Counsel, the claim of ineffective assistance of counsel has six subparts. First, Joseph claims that there was a defense based on Colorado's corporate practice of medicine doctrine/statute ("CPOM" – both hereinafter and as used in the Memorandum) which was a "core defense" and which should have been utilized. Second, Joseph claims that Trial Counsel should have called various witnesses. Third, he argues that Trial Counsel should have retained a particular expert to testify as to Joseph's state of mind. Fourth, Joseph claims that Trial Counsel was ineffective for failing to hire a jury consultant. Fifth, Joseph claims that Trial Counsel should have done certain things (assist with mitigation statement, call friends and family as witness, or obtain letters of support from them) in the sentencing phase of proceedings. Sixth, Joseph claims that Trial Counsel should have raised Batson challenges.

With respect to Appellate Counsel, the claim of ineffective assistance of counsel has three subparts. First, Joseph claims that Appellate Counsel should have raised CPOM. Second, he contends that challenges should have been raised with respect to the sufficiency of the indictment. Third, he claims that Appellate Counsel should have appealed the lack of a Batson challenge.

Consistently throughout the Motion and Memorandum, Joseph makes declarations as to what other attorneys and/or purported experts did, planned or thought. He also makes

declarations as to how various witnesses would have testified. In no instance does he provide evidentiary support for any of it beyond his own declarations.

## III. The Response.

The Response is relatively straight-forward. The government argues that various grounds or claims are barred and cannot be considered either because the claim was procedurally defaulted or because the claim was already ruled upon in the Joseph Opinion. The government argues that procedural default applies to claims three and five (choice of counsel and judicial bias) and that claims four and six (improper jury instructions) cannot be raised as the jury instruction issue was previously decided on appeal. As to the ineffective assistance claims, the government's position is that these claims fail on the merits, both as to deficient performance and as to prejudice. Finally, the government contends that as no single error has been shown, there can be and is no cumulative error.

## IV. Analysis.

### i. Ineffectiveness of Trial Counsel.

The Supreme Court has established a two-prong test to evaluate ineffective assistance of counsel claims. *Strickland v. Washington*, 466 U.S. 668 (1984) ("*Strickland*"). Joseph must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance was prejudicial. *Id.* at 687. There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* To constitute deficient performance, counsel's performance must be more than merely "wrong" in some way. It must be "completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Hoxsie v. Kerby*, 108 F. 3d 1239, 1246 (10th Cir. 1997). In terms of

prejudice, Joseph must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694.

**(a) CPOM.**

Joseph claims that Trial Counsel was ineffective in that he/they[5] failed to put on a CPOM defense. According to the Memorandum,

> Trial counsel's failure to challenge the unlawfulness of Papalini's authority as a matter of law (emphasis added), invoke the corporate practice of medicine doctrine (CPOM) C.R.S. 12-240-138 and argue that as a matter of law that Dr Joseph was acting within his legal authority as the sole shareholder owner and consistent with the laws of colorado-the CPOM and with the internal governing documents-the articles of incorporation and bylaws of Springs Medical Associates (SMA), is strategic blunder and legal malpractice.

(Memorandum at 4.)

According to Joseph, Trial Counsel should have filed motions challenging Papalini's "seizure and control of SMA." Per Joseph, Trial Counsel should have called CPOM experts and other lay witnesses to establish the CPOM defense. Trial Counsel should have pursued the defense that "Dr Joseph was acting within his legal rights as a matter of law and this negates his criminal intent." (*Id.*) According to him, this was a core defense.[6] And perhaps to emphasize the

---

[5] Joseph seems to focus exclusively on lead counsel, David Kraut. But Joseph was represented by the Office of the Federal Public Defender. Over the course of its representation of Joseph, a team of lawyers from that Office entered appearances on his behalf. Additional counsel were Natalie Stricklin, Josh Lilley, and Kathleen Shen.

[6] It should be noted that Joseph's characterization of the use of the so-called CPOM defense seems to change as necessary to fit whatever Joseph is arguing at a given time. In the Motion and Memorandum, CPOM is the defense which Joseph claims should have been used by Trial Counsel. He argues that it was not used because of Trial Counsel's deficient performance. In the Rehearing Petition filed with the Tenth Circuit, Jospeh claimed that the CPOM defense was in fact the trial defense but was not used only because this Court excluded the evidence. "The district court's exclusion of evidence relating to Papalini's violations of the CPOM doctrine … prejudiced Dr. Joseph." (Rehearing Petition at 10.) In the Certiorari Petition, Joseph was even more direct. "Dr. Joseph's defense throughout the proceedings was that he was legally obligated to remove Papalini from financial control of the practice and restore compliance with CPOM laws." (Certiorari Petition at 9.) "Dr. Joseph's defense at trial had centered on the fact that his financial transactions and control over Springs Medical Associates (SMA) were not fraudulent but were necessary steps taken to comply with state law." (Certiorari Petition at 11.) But, according to Joseph – at least then, the problem was that "The district court's decision to exclude this evidence had deprived him of the ability to provide jurors with crucial context, leading to a fundamentally unfair trial." (Certiorari Petition at 12.) If Joseph's appellate representations are true, or if he is held to his prior representations to both the Tenth Circuit and the Supreme Court, then Trial Counsel would have employed the CPOM defense had the Court not blocked it. Joseph's claim of deficient performance would fail on the merits without further inquiry as there can be

point, Joseph uses the acronym "CPOM" 77 times in the Memorandum. Joseph's claim of ineffectiveness based on the non-use of CPOM fails for multiple reasons.

**First**, Joseph's claim is based on a flawed interpretation of *Strickland*. Intentionally or not, Joseph alters the *Strickland* standard to fit his argument. According to him,

> Counsel's performance was outside the wide range of professionally competent assistance of a reasonable competent attorney that practices health care law or that of a Corporate Practice of Medicine Attorney (CPOM).
>
> *** *** ***
>
> This deficient performance is not merely below-average performance, CPOM practioners (sic) and health care attorneys from multiple jurisdictions consider CPOM defense as a bedrock principle of corporate governance of medical corporations and a core defense strategy.

(Memorandum at 3-4.)

This is not the correct standard. It makes no sense to evaluate the objective reasonableness of a criminal defense attorney's performance by comparing it to that of CPOM lawyers, patent lawyers, trust and estate lawyers, transactional lawyers or any other non-criminal defense attorneys. It is analogous to attempting to assess the adequacy of the performance of an otolaryngologist by asking what a proctologist would have done (or *vice versa*). That *Strickland* requires assessment of performance based on what criminal defense attorneys would do could not be more clear:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by

no deficient performance in failing to use a defense barred by the Court. If false, then it would appear that Joseph simply creates or changes the facts and arguments regarding CPOM as deemed necessary before different courts.

> defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

(*Strickland* at 688-89.)

**Second**, in addition to using an incorrect standard, Joseph uses the wrong methodology. He repeatedly attempts to establish that his so-called CPOM defense is a better defense than the honest belief defense used by Trial Counsel. That is not the issue. Trial Counsel is not constitutionally obligated to provide the better or the best defense. To plagiarize Justice Kagan, the Sixth Amendment does not guarantee Joseph a Cadillac defense. It guarantees only competent defense. And the competency of the defense is not determined based on whether Joseph was convicted (on only two of four original charges) or not. As *Strickland* notes:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable… A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

(*Strickland* at 689.)

Joseph argues that his original attorney, Ron Gainor ("Gainor"[7]), had put together a

[7] When Joseph was first indicted, retained counsel, Gainor, entered as counsel of record for Joseph. In the Memorandum, Joseph claims that there was actually a "legal team" of attorneys representing him. That is not accurate. Gainor is well known to this Court as criminal defense counsel. He was and has been for years on the Criminal Justice Act panel for Colorado. He is the only attorney who served as defense counsel for Joseph prior to Trial Counsel. The alleged remainder of the "team" was comprised of civil attorneys – Mark Saliman and Herrick Lidstone. While Gainor may have discussed various matters with these lawyers, it was Gainor and Gainor alone who appeared as counsel of record. When Gainor withdrew in January 2022, no other member of the "team" stepped in or claimed to represent Joseph. Yet, in an effort to infuse his claim with some gravitas, Joseph claims a "team" of lawyers developed and intended to use the "GSL Strategy" or "GSL Plan" centered around CPOM.

defense centered on CPOM. But this contention is of little to no value for three reasons. One, there is nothing offered by Joseph as to Gainor's thoughts or strategy other than Joseph's self-serving declarations. Two, the mere fact that one defense lawyer would have approached the case differently from Trial Counsel proves nothing. As the Supreme Court recognized:

> There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

(*Strickland* at 689.) Put simply, deficient performance is not established by showing that *one* competent lawyer would have tried the case differently. What is required is a showing that *no* competent criminal defense attorney would have tried the case employing the same strategy as that employed by Trial Counsel. *Bullock v. Carver,* 297 F.3d 1036, 1048-49 (10th Cir.2002) (applying *Strickland* objective reasonableness standard and suggesting that petitioner must successfully urge that no competent counsel would have proceeded in the manner that his counsel did). Three, the record suggests that the allegedly agreed upon approach endorsed by Joseph and his "team" was likely less agreed upon or viewed less convincingly in real-time than Joseph would have this Court believe.

Six months after entering his appearance, Gainor moved to withdraw. He was permitted to do so on January 20, 2022. (ECF No. 32.) To the extent that finances were an issue, Gainor (a long-time panel attorney) did not ask to be appointed under the Criminal Justice Act. He simply wanted out. According to his motion to withdraw:

> Good cause exists for withdrawal in the present case because communication between counsel and Defendant Joseph has deteriorated such that the attorney-client relationship is irreparably damaged and counsel can no longer comply

> with his duties to provide effective representation pursuant to the Sixth Amendment.

(ECF No. 28 at 2.)[8]

Even if this Court were to accept the contention that the CPOM defense was a better defense, that does not mean that the actual trial strategy employed by Trial Counsel constituted deficient performance. Such a view would result from looking down the wrong end of the telescope. The issue is whether the honest belief strategy might be considered sound trial strategy. Not whether the CPOM strategy was as good, better, or even the best strategy to employ in Joseph's case. Joseph fails to explain why the honest belief defense should not and could not be considered sound trial strategy. As noted earlier, it is not enough to claim that Trial Counsel's strategy proved to be unsuccessful or wrong.

> To be constitutionally deficient, counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.

*United States v. Holloway*, 939 F.3d 1088, 1103 (10th Cir. 2019) (citation and internal quotation marks omitted). Touting the alleged superiority of the CPOM defense does not satisfy Joseph's burden.

**Third**, there is no support for any of what Joseph says with regard to the CPOM defense as a viable defense strategy beyond Joseph's declarations. He goes on at length to identify multiple attorneys and multiple experts and to state their plans, thoughts, and strategies. But at no time does he provide this Court with anything other than his own self-serving declarations as to what these people actually thought, planned or strategized. No letters. No affidavits. No emails. Nothing to support Joseph's claim beyond Joseph's word. If all that is required to unwind a trial

[8] Coincidentally or not, just six days before moving to withdraw, Gainor moved for extension of the motion filing deadline because he and the government were "engaged in negotiations to resolve this matter and need additional time to attempt to reach agreement." (ECF No. 26 at 1.)

conviction for fraud is for the convicted defendant to say, “X lawyer and Y expert said my trial lawyer screwed up,” then criminal trial convictions would have a shelf life less than that of ice cream stored in a dresser drawer on a summer day. But this is all that Joseph does. He purports to say what this lawyer or that expert would say or do. He offers nothing substantive to support his recitation of their thoughts and beliefs other than his own, self-serving declarations.

This is not a minor quibble. It is Joseph’s burden to establish ineffectiveness by a preponderance of the evidence. That burden is not satisfied, even minimally, by Joseph’s simply presuming to speak for multiple others in an effort to speak the truth of his allegations into existence.

**Fourth**. Joseph never truly explains this “core defense” such that it can be meaningfully analyzed with respect to the offenses of conviction. He says “CPOM” repeatedly. He says that attorneys and experts believe it to be a “core defense.” But exactly what is this defense in the context of Joseph’s case? Non-medical personnel cannot make medical decisions, and shareholders of professional service corporations must be persons licensed to practice medicine under C.R.S. § 12-240-138. Fine. What else? Apart from advancing some civil dispute between Joseph and Papalini, how does CPOM relate to the counts of conviction? How does CPOM create a defense to Joseph’s obtaining COVID program funds with false certifications and using the funds solely for his own personal benefit?

Joseph calls CPOM a “law based” defense. He claims that Trial Counsel should have filed motions challenging Papalini’s authority. But Papalini’s authority or lack of authority was not an element of either offense of conviction. Joseph alleges that he was within his rights in trying to regain control of SMA from Papalini. But, to be clear, he cites no law or court opinion which provides that a violation of CPOM obligates the physician to wrest control of the

professional corporation from the violator – by any and all means, even by means of diverting federal government program funds to his personal use and benefit.

Further, what was the violation which triggered Joseph's obligation to reclaim control of SMA? If it was the Joint Action Agreement itself, why did Joseph execute it? If it was Joseph's firing, how could that have impacted the AAP funds which were obtained before his firing? How exactly did Joseph's awareness of CPOM influence any of his decisions with respect to government program funds? He never truly explains.

Even if Joseph were to present answers and explanations, he was not convicted of defrauding SMA or of wrongly taking its funds. He was convicted of embezzlement and conversion of AAP funds and wire fraud with respect to PPP funds. He testified fully at trial – under oath. He gave multiple reasons for why he believed he could take these government program funds. He explained that he was still the director and shareholder of SMA and was, therefore, entitled. But not once did he say that he was entitled or required to take government program funds due to some CPOM obligation or authorization. He never once even said "CPOM." (*See, generally*, ECF No. 164 at 12-143.) He did not claim he acted as he did because state law required him to do so. He never claimed that CPOM required him to take government program funds to keep them from Papalini. Given his lengthy and specific testimony, how can he now purport to claim that CPOM was the major root of all of his decisions and that CPOM negates his fraudulent intent? If, as his trial testimony suggests, it was not the basis for his decisions with respect to his acquisition and use of government program funds, it is not a meaningful defense to the charges.

If Joseph truly argues that state law required him to make various false certifications and to spend COVID aid funds on himself to keep them from Papalini, he needs to explain such a

remarkable and, frankly, incredible claim in some detail. He needs to identify with specificity the Colorado law which allegedly authorizes fraudulent misrepresentations with respect to government program funds. It is not the language of C.R.S. § 12-240-138. It is not the common law. So where is this requirement? It is not enough to hide behind vague and generic statements that his original "team" was ready to press a "CPOM defense." And it is not enough just to endlessly say "CPOM." The acronym is not some magical incantation that invalidates convictions simply because it is repeatedly typed or spoken.

As the Response properly states,

> The defendant's CPOM theory, even if credited in its entirety, does not answer the questions that actually mattered at trial: did the defendant make false certifications on the Accelerated and Advance Payment ("AAP") and Paycheck Protection Program ("PPP") applications? Did he misrepresent the purpose for which the funds would be used? Did he redirect government funds to accounts he alone controlled? Did he spend those funds exclusively on personal expenses such as vacation, adult entertainment, and personal bills rather than on the employee salaries and business purposes the applications certified and program rules required? The answer to each of these questions is yes, and no amount of corporate governance testimony would change that.

(Response at 5-6.)

**Fifth**, Joseph never explains why the honest belief defense used by Trial Counsel was not an objectively reasonable strategic decision. To be clear, Joseph does not claim that Trial Counsel was unaware of the CPOM issue. He does not contend that Trial Counsel was uninformed regarding the defense. He does not claim that he did not disclose and discuss this defense with Trial Counsel. To the contrary, in a post-trial airing of his grievances with Trial Counsel during a hearing on a motion to withdraw, Joseph specifically made clear that he discussed Lidstone (a purported co-author of the GSL Plan) and his testimony with Trial Counsel, but that Trial Counsel opted to pursue a different strategy.

> THE DEFENDANT: Like, for example, I asked Mr. Kraut to subpoena Mr. Herrick Lidstone, who does corporate practice of medicine on the Government's front; that I had the authority as a shareholder. I did not sign away my company. Herrick Lidstone -- the jury, Your Honor, should have heard Mr. Herrick Lidstone.
>
> THE COURT: Yet you had no issue and raised no issue with any of that until now?
>
> THE DEFENDANT: I have been raising this with Mr. Kraut, Your Honor. I've raised the Herrick Lidstone.

(ECF No. 170 at 18.)

What Joseph alleges instead of an uninformed decision is that "TC abandoned the GSL plan" (i.e., the CPOM defense). (Memorandum at 10.) He also acknowledges that this was a strategic decision, by repeatedly calling Trial Counsel's decision a "strategic blunder." (Memorandum at 2, 4, 6, 10, 16.) But apart from the fact that Joseph was convicted, he never explains why the honest belief defense was anything other than an objectively reasonable strategic choice.

In the ordinary case, Joseph must overcome *Strickland*'s "strong presumption" that the honest belief defense was within the range of reasonable professional assistance. But here, where there was an informed strategic choice by Trial Counsel, Trial Counsel's decision is "virtually unchallengeable." *Bullock v. Carver,* 297 F.3d 1036, 1047 (10th Cir.2002).

In any event, Joseph attaches far too much weight to the mere fact that he was convicted. He appears to believe that this demonstrates deficient performance. He is wrong. What it demonstrates, among other things, is that Joseph's testimony was not believed. Contrary to Joseph's current belief, conviction (on two of four counts) does not mean that Trial Counsel must have been ineffective. "[T]he trial counsel's choice of trial strategy, even when later proved

incorrect, does not without more amount to ineffective assistance of counsel." *United States v. Weir*, 657 F.2d 1005, 1008 (8th Cir. 1981).

The defense chosen by Trial Counsel was a common and often used defense to specific intent crimes. It is a straightforward and easy to understand defense. Counsel argues that the defendant lacked specific intent to defraud. The defendant testifies as to his rationale for his actions and what he believed at the time he applied for COVID relief funds. Unlike CPOM, the defense is directly aimed at the elements of the offense rather than peripheral issues. And it carries fewer complications and risks than the CPOM defense Joseph is enamored with.

For example, the redacted state court Orders used for a limited purpose at trial would become far more important (and likely to be far less redacted) with a CPOM defense. Added importance would attach as well to Joseph's testimony before the state court where (it would appear from the state Orders) that Joseph did not testify in state court that CPOM drove any of his decisions. Instead, it appears that he may have perjured himself regarding the use of government program funds. (*See* unredacted Orders at ECF Nos. 92-7 and 92-8.[9]) If Joseph were motivated solely by some unidentified requirement of law that he retake control of SMA, then Joseph would have to explain why he completely ignored state court rulings against him on this issue.[10] And if his commitment to strict adherence to the requirements of law was to be the centerpiece of his defense, then his subsequent misdirection and personal use of $240,000 in Medicare funds diverted from the bankruptcy estate in November 2020 (when he was acting as the debtor in possession) would take on far greater significance. This misappropriation of funds

---

[9] These were provided by Trial Counsel as part of Joseph's trial brief.

[10] Joseph argues in the Memorandum at 5 that his state court lawyer argued CPOM extensively in the El Paso County proceedings in which the state court Orders discussed in note 3, above, issued. If this is true, then Joseph would still have to explain why he was "required" to act by CPOM when the state court ruled otherwise in its Orders.

contrary to bankruptcy law would have been used not merely to suggest fraudulent intent from a failure to repay PPP funds with readily available funds. This $240,000 misappropriation would be directly damaging to the CPOM "had to do what the law requires" defense. Finally, if the Joint Action Agreement was contrary to law at the outset, then Joseph would have to explain why he (presumably with knowledge of CPOM) took hundreds of thousands of dollars from Papalini's company in exchange only to seek to void the agreement about two months later. He would also have to address the fact that in 2019, Joseph pledged all of the stock of SMA as collateral to an investment company (in violation of CPOM as Joseph characterizes the doctrine) as part of a personal guarantee of a separate loan to SMA from MW Investment Group. (*See* ECF No. 92-6 at ¶ 28.[11]) Choosing a defense which might create the appearance of misleading if not defrauding Papalini and/or MW Investment Group before Joseph obtained government funds would hardly be prudent. Whatever Joseph's explanation might be, it would only serve to complicate the defense. In this Court's view, the strategic scales do not so clearly tip in favor of CPOM that the honest belief defense must be objectively considered to be "completely unreasonable."

This Court concludes that a strategic decision was made by Trial Counsel.[12] That decision was an objectively reasonable one under all of the circumstances at the time the

[11] A description of the MW Investment Group loan and guarantee is contained in a complaint filed in Bankruptcy Court by SMA's trustee in order to initiate an adversary proceeding against Papalini. This complaint was provided to the Court by Trial Counsel as an exhibit to Joseph's trial brief. (ECF No. 92-6 at 5.) Trial Counsel also identified the MW Investment Group loan and personal guarantee as defense exhibits on Joseph's trial exhibit list, but they were not introduced. (*See* ECF No. 114.) Today, the MW Investment Group documents can be found in the docket of the adversary proceeding *Lofstedt v. MW Investment Group, LLC,* No. 22-01261, Doc. Nos. 1-1, 1-2, and 1-3 (Bankr. D. Colo. 2022).

[12] Trial Counsel essentially confirmed as much at a post-trial hearing on a motion to withdraw. After Joseph complained as to such matters as not calling Lidstone, Trial Counsel offered: "Now, if the Court would like for me to address the strategic decisions, I can, but I think –" As the Court was dealing only with a motion to withdraw days before sentencing, the Court said "No" to avoid further intrusion into attorney-client communications in advance of sentencing. (ECF No. 170 at 23.)

decision was made. As an informed strategic decision, Trial Counsel's choice of a simple, straightforward, and well-established defense to the charged offenses was and is "virtually unchallengeable." *Strickland* at 690. Joseph has not satisfied his burden to show that the defense chosen by Trial Counsel was the product of deficient performance. His burden is not met by alleging that Trial Counsel should have filed some pretrial motion challenging Papalini's authority or actions. Such a motion (assuming the propriety of a such a pre-trial motion under Rule 12(b)(1), Fed.R.Crim.P.) was irrelevant to Trial Counsel's chosen defense. Trial Counsel is not required "by the Sixth Amendment to file meritless motions." *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995). Meritless motions cannot have an impact on the trial. Similarly, it follows that Trial Counsel is not required to file pre-trial motions which do not advance counsel's strategic choice of defense either.

**Sixth**, Joseph has not demonstrated prejudice. Repeatedly, he casts matters as a binary choice. Papalini was in the wrong or Joseph was. This entire characterization is simply incorrect. Even if Papalini was as manipulative and conniving as Joseph claims him to have been, this does not make Joseph "not guilty." As the Joseph Opinion notes, "Robust direct and circumstantial evidence exists to support Joseph's convictions on both counts." (Joseph Opinion at 1281.) Despite his unwillingness to accept it, this matter is *United States v. Joseph*, not *Joseph v. Papalini.*

**(b) Failure to Call Witnesses.**

The Memorandum identifies witnesses or sets of witnesses that Joseph alleges should have been called. These include Papalini and Wilner as well as others (some only vaguely described - e.g. "Shannon from Medicare"). Joseph deigns to speak for all of them and describes what their testimony would have been. The purpose of calling these witnesses would largely be

to further the CPOM defense. Deficient performance has not been established by noting that these people were not called.[13] As the Court has already concluded, Trial Counsel was not objectively unreasonable in adopting a different defense strategy. That aside, the Motion does not establish ineffective assistance with respect to these witnesses for a more fundamental reason.

Joseph does not get to speak for a multitude of others. Yet it is only he who says what the witnesses would actually have said at trial.[14] This is improper. Joseph must do more than simply declare what he believes a witness would have said. He must offer some actual evidence of the expected testimony (typically in the form of an affidavit or other testimony from the witness) as well as evidence of the witness's willingness to testify. *See, e.g.*, *Snow v. Sirmons*, 474 F.3d 693, 730 n.42 (10th Cir. 2007) (under *Strickland*, a litigant "must show … that the testimony … would have been favorable, [and] that the witness [actually] would have testified at trial"); *United States v. Gallant*, 562 F. App'x 712, 715 (10th Cir. 2014) ("[M]ovants offer nothing but their own descriptions of these witnesses' prospective testimony.... These unsupported descriptions, which also fail to show that the uncalled witnesses would have testified at trial, are insufficient to show prejudice."); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form

---

[13] Joseph attempts to support his claim that certain corporate governance witnesses should have been called by quoting portions of this Court's Order Denying Motion for New Trial. There, the Court noted that Joseph could have called any corporate expert to present testimony that Joseph was acting within his corporate rights. Context matters. Such statements were made to demonstrate that the "new evidence" which was said to justify a new trial had always been present and available to Joseph. The Court never claimed that such evidence should have been the centerpiece of the trial defense. This Court simply noted that nothing about such evidence was "new" within the meaning of Rule 33, Fed.R.Crim.P.

[14] Joseph's representations are known to change. For example, the Memorandum suggests that Herrick Lidstone, a potential expert, would testify that Joseph was entitled to control SMA as a "matter of law" due to CPOM. (Memorandum at 6.) But at the May 30, 2023, hearing on Trial Counsel's motion to withdraw in advance of sentencing, Joseph described Lidstone differently. There, his desired testimony was represented as being that Joseph had authority over SMA "as a shareholder." (ECF No. 170 at 18.) But this was no more than what Joseph argued at trial (without opposition) – that he remained the sole shareholder of SMA after the Joint Action Agreement was executed.

of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") Joseph again fails to carry his burdens.

**(c) State of Mind Expert Witness.**

Joseph claims that Trial Counsel was ineffective for failing to retain and call "Dr. Mark Mills MD JD." This claim of ineffectiveness lacks merit. According to Joseph, Gainor wanted this expert to testify. The psychiatrist "was willing to testify as to Dr Joseph's state of mind at the time he took the PPP loan, his lack of any criminal intent and the tremendous pressure he was facing battling COVID all by himself with staff members and patients dying." (Memorandum at 6-7.)

Several questions come to mind. How was this witness willing to so testify when Gainor had only "recommended … that we needed to hire" Mills? (Memorandum at 6.) If Mills had not been retained and had not yet authored an expert report, how can Joseph claim anything as to what this person would have offered by way of expert opinion? And was the "heroic" testimony as described by Joseph truly testimony Trial Counsel should have attempted to use? Even though Joseph made certain that every dollar of government funds went into his pockets and not a cent to help those staff members and patients dying all around him? Despite the fact Joseph has provided nothing showing that Gainor, an experienced federal criminal defense attorney, even made such a recommendation? Despite the fact that Rule 704, Fed.R.Evid., explicitly prohibits Mark's supposedly intended testimony? ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.") Describing Trial Counsel as constitutionally ineffective for failing to call an expert to

offer speculative and inadmissible testimony is a claim which fails – utterly.

**(d) Jury Consultant.**

This allegation of ineffectiveness is nothing short of frivolous. Trial Counsel was not obligated to hire a jury consultant for Joseph. It is a claim born of nothing but self-perceived entitlement. Joseph basically argues that counsel in a criminal case must use a jury consultant or else be branded as ineffective. Joseph might as well claim that Trial Counsel was ineffective in failing to hire a body language expert or other expert *du jour*. Regardless of whether retained counsel spoke about doing so, or whether some civil lawyers do so, or whether the "GSL Plan" envisioned it, the Sixth Amendment does not require appointed counsel to retain jury consultants. Nor does the Sixth Amendment require appointed counsel to hire everyone (or anyone) that one retained attorney might have previously suggested.

Joseph does not seek a Cadillac defense. He wants a Rolls-Royce defense. The Sixth Amendment is not so generous. In no way does Trial Counsel's decision constitute constitutionally ineffective assistance. Even if it did, Joseph cannot demonstrate a reasonable probability that the trial proceedings would have been different if only a jury consultant had been retained. He cannot even establish that a different jury would have been selected. At best, he can only speculate.

**(e) Sentencing Assistance.**

There are multiple problems with this claim. The Court starts with jurisdiction or, perhaps more properly, the absence of a redressable injury. Joseph received a 30-month imprisonment sentence. He completed that sentence on December 4, 2025. (*See Joseph v. Warden,* Case No. 25-cv-02428, Doc. No. 57 at 2 (M.D. Pa. Aug. 20, 2026).) The incarceration period cannot now be reduced. Supervised release cannot be modified to make up for any

sentence which might be found to have been too long. Joseph makes no challenge as to any term of supervised release. And so, to the extent that Joseph seeks to rely on alleged sentencing errors, his petition is moot. *United States v. Zamora*, 791 Fed.Appx. 693, 696 (2019). Alternatively, as Joseph's requested relief is "Order New Trial Vacate Conviction," nothing by way of any perceived sentencing error could authorize the Court to grant such relief. Put differently yet again, no deficient performance with respect to sentencing results in any actionable prejudice with respect to the earlier trial convictions. Consequently, constitutional ineffectiveness entitling Joseph to have his convictions vacated has not been shown.

The claim is inadequate in any event. It is based on three alleged deficiencies: (1) Trial Counsel did not help Joseph write his allocution statement, (2) Trial Counsel did not help in submitting recommendation letters, and (3) Trial Counsel did not call witnesses at sentencing to speak to Joseph's character. The Court is unaware of case law suggesting that any of these things supports a claim of constitutional ineffectiveness. Joseph provides none. Nonetheless, each of Joseph's bases will be briefly discussed.

Starting with the reason that Trial Counsel did not assist in the allocution statement, that reason is known to this Court. Joseph would not work with counsel. In fact, during a May 30, 2023, restricted hearing on Trial Counsel's motion to withdraw, it was Trial Counsel who brought to the Court's attention counsel's concern that he had not worked with Joseph on allocution because Joseph would not work with him. (ECF No. 170 at 24-25.) In any event, Joseph was in no way inhibited. Compared to most defendants, Joseph spoke extensively and without difficulty at sentencing. (ECF No. 166 at 86-93.)

As for letters, Joseph was on bond. He could have contacted all the friends and family he wanted in an effort to obtain letters of support. The cover letter of his Presentence Report told

him that such letters could be submitted directly to the probation office which would provide the letters to the Court. (ECF No. 136 at 1.) No letters were sent by anyone. Joseph identifies no one who wanted to write but was in any way prevented or deterred by the action or inaction of Trial Counsel.

As for the desired parade of supporting witnesses at sentencing, this Court does not engage in that practice. Counsel speaks. And the Court typically engages with counsel. Victims get to speak as the law requires it. The Defendant speaks. But the Court does not engage in what it considers to be "performance sentencing." This Court consistently refuses to turn sentencing hearings into needlessly protracted hearings where testimony from character and other witnesses is put on live by each side in an attempt to sway the Court's emotions or decisions. Trial Counsel knew this. It has been the Court's practice for years. No law requires the Court to sentence in the manner that Joseph thinks it should. Joseph was deprived of nothing by Trial Counsel.

And, again, Joseph presumes to speak for others. He references colleagues, patients, staff and family from two states. Not a single one is identified. No *evidence* is presented as to what anyone wanted to say, if anything. It is all just more self-serving declaration from Joseph.

Finally, Joseph has completely failed with regard to his burden to demonstrate prejudice. Nothing has been presented which shows a reasonable probability that a different sentence would have been imposed if some unnamed person wrote or spoke or if Trial Counsel helped to polish Joseph's allocution.

**(f) Batson Challenges.**

Joseph claims that the government was racially motivated during jury selection and that Trial Counsel was deficient for not contesting the government's actions through Batson

challenges. He focuses on two preemptory challenges. On this issue, Joseph is often fast and loose with the truth.

The first venireman, E.H.,[15] is said to have been struck because he was "an Asian" whose "ethnicity … fits squarely with the defendant." (Memorandum at 8.) According to Joseph, "this Asian physician is a successful physician from Asia." (Memorandum at 8.) Not so much.

E.H. is presumed to have some ancestral roots on the Asian continent. His surname appears to be of Chinese origins. Joseph is from India. The Court would not call these ethnicities to be "square fits" for one another. If ancestors sharing a continent is all it takes for a "square fit," then Joseph is also a "square fit" for Russians, Kuwaitis, Koreans, and about 44 other nationalities on the Asian continent. And E.H. is not a successful physician "from Asia." That is an unsupported declaration. One which is fiction, complete with just a skosh of stereotyping.

The Court has no reason to consider E.H. to be anything other than an American by birth. E.H.'s name is not a common one in Colorado, and his biography and photograph are easily found online at medical facilities with which he is associated. He attended college at an Ivy league school on the east coast. He obtained his medical degree and completed his residency in the United States as well. During voir dire, he identified the *only* places outside of Colorado where he has ever lived as being Connecticut, New York, California and Texas. (ECF No. 160 at 105.) Nothing supports the suggestion that he is a foreign-born physician "from Asia."

The Court turns to the challenge. The government used its third preemptory challenge on E.H. It turns out that both sides had concerns about E.H. The government obviously did as it exercised a preemptory. But Trial Counsel did as well. Trial Counsel wanted further inquiry as to

[15] The Court is aware of the identities of both of the venire persons to whom Joseph refers. The Court will not name them herein except by initials. Their full names are shown on ECF 100. The "Asian Doctor" is government number 3. The "Hispanic minority" is number 1. The government exercised two other preemptory challenges. The other two have "Anglo-Saxton" surnames.

whether E.H. might have some animosity towards Joseph and the crimes he was accused of committing. (ECF No. 160 at 109.) Why? E.H. was a physician whose medical practice applied for and received both AAP and PPP funds. He was married to another physician who also had "the same similar issues that we already discussed previously." (ECF No. 160 at 104.) Those issues were receipt of COVID programs funds by the medical practice. As E.H. had indicated that he could be fair, the Court did not allow additional questioning - potentially setting up an appellate issue for Joseph which the government mooted by using a preemptory.

Trial Counsel technically could have made a Batson challenge but was uncertain whether the physician was good or bad for his client. This alone is enough to establish that the failure to make a challenge was not deficient performance. In addition, the record (voir dire, the absence of strikes without an apparent reason, pattern of strikes, the make-up of remaining panel members) does not reveal, and Joseph does not offer, proof of purposeful discrimination. Without more than what has been shown, Trial Counsel cannot be considered ineffective for failing to make a Batson challenge.

But what if Trial Counsel raised Batson anyway? The Court would have inquired of government counsel to see whether the government had a race neutral reason for exercising the preemptory. If a race neutral reason was offered, the Court would determine whether purposeful discrimination had been shown. There was an abundance of neutral reasons for the government to exercise a preemptory. E.H. was simply too close to the facts in multiple ways. The Court remembers E.H. clearly. Absent a complete inability on behalf of the government to proffer a reason for the preemptory, there is no reasonable probability that the Court would have concluded that the government engaged in purposeful discrimination. In the Court's view at the time, someone was going to strike E.H., it was just a question of who and when.

While Joseph makes his unwarranted allegation of racial discrimination, he cripples his own argument by acknowledging a non-racial basis for the preemptory: "he was an Asian and **a Physician and his** ethnicity and **profession fits squarely with the defendant**." (Memorandum at 8, emphasis added.) Joseph seeks to extend Batson beyond races and genders. To professions. "Discrimination in jury selection, whether based on race or gender **or professions**, causes harm to the litigants…" (Memorandum at 9.) This is not a proper basis for a Batson challenge. It is not the law. And physicians are by no means members of a protected class.

The Court turns to the second venireman, J.C., the "Hispanic minority." This was the government's first preemptory. There was nothing preceding this preemptory which would suggest a trend or tendency to strike minorities. Joseph simply calls J.C. an "Hispanic minority" as if that, standing alone were enough. It is not. But all that Joseph does beyond this is return to a discussion of the "GSL Plan" and how Gainor wanted to pick a jury - as if that has any relevance to whether the government was engaging in purposeful discrimination. It does not.

There were things about J.C. that might have caused concern for any lawyer. He first professed to be a "law student dropout" who had two years of legal education and was studying criminal law. At Regis. (ECF No. 160 at 57.) But Regis does not have a law school. And minutes later, he changed and called himself a "college dropout" who was interested in "thermal dynamics." (ECF No. 160 at 71.)

Joseph has presented nothing showing a prima facie case of discrimination or any reason for counsel to have raised a Batson challenge. Joseph claims he wanted a challenge and perhaps he did. But his wishes do not require counsel to slavishly follow them with regard to matters, like jury selection, which are generally considered to be within the strategic province of counsel. There was no basis other than J.C.'s apparent race for Trial Counsel to raise a Batson challenge

with respect to the government's very first preemptory. There is nothing now presented suggesting that the government would have been unable to articulate a race neutral reason for striking J.C. And nothing has been presented which suggests a reasonable probability that the Court would have found purposeful discrimination.

Finally, to the extent that Joseph paints himself as the victim of a "pool of all white jury," he seemingly overlooks Juror No. 100444246 who was on the petit jury and whose surname might suggest Hispanic ancestry equal to J.C.'s. (*See* ECF No. 102 at 2.)

**(g) Trial Counsel Summary.**

Whether the various alleged deficiencies of Trial Counsel are examined individually or in combination, constitutional ineffectiveness has not been shown. Joseph has failed to carry his burden to show objectively unreasonable decision making or performance. All he has done is repeatedly express an "after the fact" (and years after the fact) preference for different decisions. The primary basis for this preference is nothing more than the fact that Joseph was convicted. He cannot overcome the applicable presumptions of reasonableness. Presumptions aside, he has never placed Trial Counsel's decisions in their proper context and shown them to be *objectively unreasonable* when made. Nor has he shown prejudice. What he claims is, "But here the prejudice is manifest in the outcome of the trial-conviction." (Memorandum at 17.) This is not a demonstration of *Strickland* prejudice. Joseph must show a reasonable probability that the proceedings would have been different had his alleged errors not occurred. He has never shown such a reasonable probability. All that he has done, and done repeatedly, is argue that Gainor – his first attorney and one with whom Joseph had irreconcilable differences – would (allegedly) have done things differently. This proves nothing.

**ii. Ineffectiveness of Appellate Counsel.**

An appellate attorney's obligation is not to raise every conceivable claim on appeal. Appellate "counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). In alleging ineffective assistance of Appellate Counsel based on the failure to raise claims, Joseph must show more than his belief that a particular argument should have been made.

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

*Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

Appellate Counsel selected the issues which were best supported by the record below. She did not include issues which had never been raised in the district court and as to which no meaningful record existed. Joseph claims that three issues should have been appealed: (i) CPOM, (ii) indictment irregularities, and (iii) Batson challenges. At no point does Joseph address the difficulty that Appellate Counsel would face raising issues which were never raised in the district court. At no point does Joseph explain why sticking with matters of record was objectively unreasonable.

The Court has already addressed CPOM. The Batson challenge has been addressed as well. In terms of "indictment irregularities," all that the Memorandum does is make a vague reference, in a single sentence, to irregularities and then refer the Court to his appeal[16] of an Order (ECF No. 207) denying his post-conviction motion for release of transcripts of grand jury proceedings (ECF No. 206). What Joseph requested in that motion was production of grand jury proceedings to see what Papalini said to the grand jury and to see why Papalini was not indicted. Joseph's suspicions do not constitute indictment deficiencies which should have been raised on appeal with no support in the record. This has no bearing on the matters now before the Court.

Each of Joseph's alleged deficiencies of Appellate Counsel has one thing in common – not filing claims with respect to matters never raised in district court. With the matters not having been raised, Appellate Counsel was strategically correct in deciding not to include such arguments in her brief on appeal. "Absent extraordinary circumstances, [this court] will not consider arguments raised for the first time on appeal. This is true whether an appellant is attempting to raise a bald-faced new issue or a new theory that falls under the same general category as [a previous] argument." *United States v. Viera*, 674 F.3d 1214, 1220 (10th Cir. 2012) (quoting *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002)).

Joseph never explains why Appellate Counsel should have even considered raising issues which were never raised in the district court when other, more viable appellate issues existed. He simply declares deficient performance. This falls short of establishing *Strickland* prejudice. To show prejudice flowing from Appellate Counsel's failure to include his desired issues in a merits brief, Joseph must show "a reasonable probability that, but for his counsel's unreasonable failure to file, he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct.

---

[16] The appeal brief referenced is *United States v Joseph*, Case No. 26-1106, Doc. No. 15 (10th Cir. Jun. 23, 2026).

746, 764 (2000). All that Joseph has done is to claim, "In hindsight, I wish I was firm and iron clad in my resolve to raise CPOM and call Papalini as a witness - a well thought out plan by the GSL plan." (Memorandum at 19.) *Strickland* prejudice is not established by Joseph's mere wishes and beliefs.

**iii. Denial of Choice of Counsel.**

Joseph alleges that he was denied his choice of counsel. He claims to have sent an email in which he "terminated" Trial Counsel.[17] He claims that he had arranged to retain Beau Brindley, a defense attorney from Chicago ("Brindley"). (Joseph apparently was not looking to rehire Gainor, the architect of the GSL Plan or other members of the original "team.") According to Joseph, a hearing was subsequently held where the Court "*unreasonably and arbitrarily interfered*" with his choice of counsel in some unspecified manner. (Memorandum at 19.) Again, Joseph is fast and loose with the truth.

After Joseph was convicted, a presentence interview was scheduled by the Probation Office. On February 10, 2023, the same day that a defense pleading with respect to a forfeiture issue was due to be filed, Brindley emailed the Probation Office and requested that the interview be rescheduled. Trial Counsel confirmed Joseph's intention to retain Brindley. After doing so, Trial Counsel moved to extend the filing deadline and advised the Court of the above facts. (ECF No. 128.) As of February 13, 2023, no entry had been filed by Brindley. The Court then extended the filing deadline to February 16, 2023, advising that it would not continue to wait long for a one-line entry of appearance to be filed. (ECF No. 129.) Brindley did not appear by that date, and Trial Counsel filed the pleading then due. By February 21, 2023, Brindley had still not entered, and the date of the presentence interview was approaching, as was the April 6, 2023,

[17] To this day, Joseph fails to recognize that he cannot "fire" counsel appointed by the Court.

sentencing date. (*See* ECF No. 165 at 37 for sentencing date.) Trial Counsel moved to continue the sentencing hearing. (ECF No. 128.) The Court granted the motion and continued sentencing until June 1, 2023. But it noted that if a probation interview still could not be timely conducted, the Presentence Report could be submitted without one. Brindley still did not file an entry of appearance. On March 10, 2023, Joseph was interviewed by the Probation Office in the presence of Trial Counsel. (ECF No. 141 at ¶ 62.) Again, sentencing approached, still with no entry from Brindley.

In late May 2023, Jospeh emailed a letter[18] to Trial Counsel demanding that counsel withdraw. On May 26, 2023, Trial Counsel filed a motion to withdraw (ECF No. 143), seeking appointment of substitute *appointed counsel*. The Court set and held a hearing on May 30, 2023. At that hearing, the Court reviewed Joseph's complaints. Joseph's words were, "And all that I'm asking is that you appoint a new CJA." (ECF No. 170 at 22.) The Court recounted in detail various delaying and stalling tactics engaged in by Joseph over the life of the case. (*See*, *generally*, ECF No. 170.) The motion for new appointed counsel was then denied. And any continuance of sentencing was denied as well. At the very end of the restricted portion of this hearing, Trial Counsel asked what would happen if Joseph somehow retained counsel before the scheduled sentencing. The Court's response was, in essence, that he better be ready for sentencing on June 1. (ECF No. 170 at 29.) No retained counsel ever entered.

To the extent that Brindley had actually ever been retained, he had about 3½ months to file an entry. He never did.[19] The Court never prevented that or interfered as claimed. To the

[18] This letter was later provided to the Court and was docketed at ECF No. 146-1.

[19] Joseph claims that Brindley would not enter until Trial Counsel had withdrawn so that Brindley would not be associated with Trial Counsel's errors. That explanation is, again, supported by nothing but Joseph's declaration. It makes no sense whatsoever. It is commonly understood that if retained counsel enters in a case, appointed counsel immediately moves to withdraw, and that motion is routinely granted. There is no responsibility for earlier decisions placed on newly retained counsel. Further, for appointed counsel to withdraw first and then have the Court wait for retained counsel to enter leaves a gap in representation which this Court would never find acceptable. But it is of no

extent that the Court denied Joseph's choice of counsel at the May 30, 2023, hearing, the request was for new *appointed counsel*. Joseph has no right to choice of appointed counsel. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006) (Sixth Amendment provides the "right of a defendant who does not require appointed counsel to choose who will represent him."). Factually, the claim is wholly lacking in merit. Furthermore, it has nothing whatsoever to do with Joseph's convictions. Only with his sentence.

All of this hardly matters as Joseph's claim has been procedurally defaulted. "The Supreme Court has 'long and consistently affirmed that a collateral attack may not do service for an appeal.'" *United States v. Harms*, 371 F.3d 1208, 1211 (10th Cir. 2004). A defendant who fails to raise an issue on direct appeal is barred from raising it thereafter in a § 2255 proceeding. *United States v. Cook,* 997 F.2d 1312, 1320 (10th Cir.1993). To overcome default, Joseph would need to show either cause and prejudice or a fundamental miscarriage of justice. *United States v. McGaughy*, 670 F.3d 1149, 1159-60 (10th Cir. 2012). Joseph has not presented cause.[20] A miscarriage of justice requires Joseph to make a colorable showing of his factual innocence. *Sack v. Champion*, 133 F.3d 932, at *2 (10th Cir. 1998) (unpublished). No such showing has been made.

**iv. Improper Jury Instructions.**

Joseph contends that the Trial Court should have instructed the jury that improper spending of PPP funds is not a crime as Trial Counsel had requested. This claim is barred as it was raised and decided on direct appeal. Issues raised and resolved on direct appeal may not be relitigated in a § 2255 proceeding. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

---

moment as this "withdraw first" demand was never presented to this Court by Trial Counsel or by Joseph himself. Joseph had ample opportunity to do so as he spoke extensively at the May 30, 2023, hearing.

[20] While ineffective assistance of counsel may be cause to excuse a procedural default, Joseph has not alleged ineffective assistance of Appellate Counsel with respect to his choice of counsel claim.

On appeal, Joseph raised this very issue and asked the Tenth Circuit to find error in this Court's failure to give a requested instruction. The Joseph Opinion resolved the matter. "We conclude the district court did not abuse its discretion in declining Joseph's request." (Joseph Opinion at 1285.) Joseph does not get to litigate the matter again.

**v. Judicial Bias.**

Joseph raises this issue in a single sentence. He says, "See Motion to Recuse and reassignment to a neutral Judge to address this 2255 Motion." (Memorandum at 20.)

The motion that he references (ECF No. 221) addresses only matters occurring post-conviction – primarily the Court's response to Joseph's Motion for New Trial. As the motion to recuse deals with matters occurring years after Joseph's conviction and seeks only to have another court decide the instant Motion, it does not state grounds for vacating Joseph's convictions. The motion to recuse has already been denied in any event. (ECF No. 222.) Moreover, it, too, is barred by procedural default to the limited extent that it may be perceived as relating to matters occurring prior to entry of judgment in this case.

**vi. Failure to Give Jury Instruction and Flaming (sic) the Jury.**

This is largely the same ground for relief as set forth as Joseph's fourth ground. Repeating it changes nothing. The claim is barred because it was resolved on appeal. If Joseph means to refer to some other jury instruction which was not given, the claim is barred by procedural default. The only thing that this claim or ground raises that is different from ground four is the contention that the government enflamed the jury in closing argument. Although he does not specify the statement, it is likely the following. "This was a limited pot of money, offered to small businesses… [E]very time the defendant took funds from this pot of money another business didn't get it." (ECF No. 164 at 227.)

This issue was not raised on direct appeal. As explained earlier in connection with Joseph's choice of counsel grounds, the claim is, therefore, procedurally defaulted as it was not raised on direct appeal.[21] Joseph cannot pursue this claim in his § 2255 proceedings.

**vii. Cumulative Error.**

As this Court has found no merit with respect to Joseph's various claims, there is no cumulative error. But Joseph may be making a slightly different argument than a standard cumulative error argument. He points to that portion of the Joseph Opinion that found harmless error with respect to the lay testimony of a government witness (Michael Petron). (Joseph Opinion at 1282-84.) Perhaps Joseph argues that the matters raised in the Motion and Memorandum combine with this harmless error to create some grounds for relief. If this is Joseph's argument, it is declaratory, vague and largely unexplained. Regardless, nothing in the Motion constitutes a basis for the requested § 2255 relief – alone, in combination, or when added to previously found harmless error. Prejudice is not generated by adding harmless error to meritless or barred claims.

## V. Conclusion.

According to Joseph, Trial Counsel was wrong. Appellate Counsel was wrong. Government counsel was not only wrong, but intentionally discriminatory. This Court was wrong and biased. Moreover, one of its rulings on jury instructions (affirmed by the Tenth Circuit) was "slimy." (Memorandum at 20.) Joseph was a victim - of Papalini, of a racially selected jury, and of judicial bias. Therefore, he claims to be entitled to relief from convictions obtained through a fair trial and affirmed on appeal. He is not so entitled.

[21] As before, Joseph does not claim ineffective assistance of Appellate Counsel for failing to raise this issue.

Joseph has failed to carry his burden of demonstrating constitutionally ineffective assistance of counsel. Trial and Appellate Counsel did not render deficient performance, and Joseph has not shown the requisite prejudice. As explained above, his remaining claims are factually wrong, barred, or do not support his requested relief.

The Motion is meritless.

This matter can be and is conclusively resolved on the basis of the Motion, the Memorandum, the Response, and the files and records of the case. As a result, no hearing is required. For all of the reasons set forth above,

IT IS ORDERED:

That the Motion (ECF No. 219) is DENIED;

That the Clerk of the Court is DIRECTED to reissue Judgment in this matter as of this date;

That no basis exists on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c); and

That it is certified that any appeal from this Order is not taken in good faith, therefore, *in forma pauperis* status is denied for purposes of any appeal.

DATED this 19th day of October, 2026.

BY THE COURT:

RAYMOND P. MOORE
Senior United States District Judge